UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Criminal No. 11-10212-JLT** |
| | ) | |
| **1.    JOHN WILLIS** | ) | |
| **a/k/a "Bac Guai John"** | ) | |
| | ) | |
| **Defendant.** | ) | |

**GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT'S MOTION TO SUPPRESS**

The United States of America by its undersigned attorneys hereby submits this

memorandum of law in opposition to the Defendant John Willis' motion to suppress the wire

interceptions.  For the reasons discussed below, the government respectfully requests that the

Court deny the motion to suppress without a hearing.

I.    BACKGROUND

    A.    Procedural History

On October 7, 2010, United States District Judge Joseph L. Tauro issued an order

authorizing the FBI to intercept wire communications over a cell phone used by Wei Xing Chen

(hereinafter "target telephone 1") for thirty days.  On October 14, 2010, the FBI began

intercepting wire communications over target telephone 1.  On November 24, 2010, United

States District Judge Rya W. Zobel issued an order authorizing the FBI to continue to intercept

wire communications over target telephone 1 for an additional thirty days and to begin to

intercept wire communications over two additional cell phones: one used by Defendant John

Willis ("target telephone 2") and one used by Minh Cam Luong ("target telephone 3").[1]  In

----

[1]Chen is the lead defendant in United States v. Wei Xing Chen, et al., Cr. No. 11-10252-
NMG; Luong is the lead defendant in United States v. Minh Cam Luong, et al., Cr. No. 11-

support of its November 24, 2010, application, the government submitted the Affidavit of

Special Agent Timothy C. McElroy dated November 24, 2010 (hereinafter "McElroy

Affidavit").  Later, on the basis of information obtained by the interception of target telephones

1, 2, and 3, and additional investigation, the government obtained orders authorizing the

continued and initial interception of target telephones 2 through 9, including additional

telephones primarily used by the Defendant (target telephones 4 and 9).  The Defendant moves

to suppress the initial order and, presumably, also seeks to suppress subsequent orders as to his

telephones as fruit of the poisonous tree.

     B.    Facts

The McElroy Affidavit primarily detailed three different, but simultaneous, criminal

activities of the Defendant: trafficking both oxycodone and marijuana; attempting violent

reprisal on behalf of his criminal associate, Chen; and collecting debts by extortionate means.[2]

     1.    *Drug Dealing*

With regard to drug dealing, the Affidavit first detailed information from a cooperating

source ("CS-4") that the Defendant was trafficking oxycodone.  Specifically, CS-4 stated that,

starting in November 2009, the Defendant began a scheme in which he shipped 10,000 to 20,000

"perk-30's" [Percocet tablets, which contain oxycodone, a Schedule II controlled substance]

from Florida to Boston.  CS-4 reported that the Defendant had a connection with "Brian," a

10251-PBS.  These two cases and the instant case all arose from the same wire investigation.

[2]The McElroy Affidavit offered information regarding three target telephones and numerous target subjects and interceptees.  Because the criminal activities of various target subjects intersected and overlapped, the Affidavit organized the facts chronologically instead of by target subject or target telephone.  For the purposes of this memorandum, the government cites only the facts regarding the Defendant and target telephone 2.

security employee for an MRI clinic in Florida.  CS-4 further reported that the Defendant paid

people to fly to Florida, visit the clinic for an MRI, and obtain and fill prescriptions for 240

percocets, which were given to the Defendant for further distribution.  According to CS-4, the

Defendant had a group of people working for him who were responsible for recruiting people to

fly from Massachusetts to Florida and then return to Massachusetts with the pills. [McElroy Aff.,

¶ 11.]

The McElroy Affidavit thoroughly vetted CS-4' reliability as an informant by

exhaustively listing its criminal history; its history as an informant; the fact that no benefits were

provided; and the FBI's success at corroborating CS-4's information.  For example, according to

the McElroy Affidavit, the FBI corroborated CS-4's statements that

- the Defendant was raised in Chinatown and spoke Cantonese fluently.
- the Defendant did not have a driver's license but currently drove a Hummer and possibly a Mercedes worth $120,000, although neither was in his name.
- the Defendant used to run brothels in Boston, staffed by Asian females who were brought into the country through California.
- the Defendant had been involved in Asian organized crime
- the Defendant spent hundreds of thousands of dollars at Foxwoods Casino (for example, as detailed in the McElroy Affidavit at fn. 13, the Defendant had a total buy in at Foxwoods for 2009 of $196,025 and for 2010 of $133,460, for a two year total of $329,485).

[McElroy Affidavit, ¶ 11, nn. 4 and 5.]

Most significantly, the McElroy Affidavit described a stop of the Defendant on October

20, 2010, carrying a large amount of cash to which a drug dog alerted, which was independent

evidence of the Defendant's drug trafficking and further corroborated CS-4's statements to the

FBI.  As explained by the McElroy Affidavit, TSA officials stopped the Defendant in Logan

Airport attempting to board a flight to Ft. Lauderdale with a counterfeit driver's license (as

3

stated by CS-4) as his identification.  The Defendant admitted to TSA officials that the license

was counterfeit, that he was a convicted felon, and that he had approximately $4,000 in cash on

his person and another nine or ten thousand dollars in his checked luggage.  Massachusetts State

Police ("MSP") investigators were called and conducted a consensual interview with the

Defendant, during which he could not explain to MSP how he obtained the money, said that it

was all the money that he had, and could not explain why he wanted to bring his life savings to

Florida.  Investigators did not believe the Defendant's story and seized the $3,990 that he

carried.  The Defendant's checked luggage made the trip to Ft. Lauderdale, where a drug-sniffing

dog alerted to the baggage, which was a positive indication for the presence of drugs.  The bag

was searched and approximately $9,600 was located and seized.   The McElroy Affidavit

concluded that the cash was the product of drug dealing, which conclusion is bolstered by the

fact that the drug-sniffing dog alerted to the bag; and that the Defendant was traveling in

furtherance of criminal activity such as the percocet scheme described by CS-4. [Id., ¶ 12.]

    The McElroy Affidavit also detailed a marijuana deal in which the Defendant

participated on November 5, 2010.  At 6:13 p.m. that day, surveillance agents saw the following:

the Defendant and an unidentified Asian male both using cell phones (although not target

telephone 2), entering the Defendant's Hummer and driving south down Harrison Avenue into

South Boston.  The Hummer pulled up alongside a red Chevrolet sedan, registered to Hertz

Rental Cars and rented to Colby Deering (the registered owner of the Bentley which the

Defendant regularly drove), in front of 249 A Street.  A white male got out of the Chevrolet,

went to the driver's side of the Hummer, spoke to the Defendant, went to the rear of the

Hummer, removed a large, dark colored piece of luggage with wheels, rolled the luggage to the

Chevrolet, and placed it in the trunk.  The two cars then both made U-turns and the Chevrolet

followed the Hummer back to Chinatown.  The two cars then parked on Harrison Avenue with

the Chevrolet next to a white, Honda Odyssey minivan.  The white male from the Chevrolet

removed the piece of luggage that had previously been in the Defendant's Hummer and placed it

in the back of the Honda.  All three cars then drove to CRU Wine and Spirits on Washington

Street in the South End, where the male from the Chevrolet entered the store and acted as if he

was working.  The Defendant later entered the store and spoke to the man.  [Id., ¶ 96.]

      Agents made further observations which confirmed that the Defendant had provided

marijuana to the Asian male in the white Honda minivan.  Surveillance agents further saw the

following: starting at 8:20 p.m., a black Lincoln Continental SUV, driven by Target Subject

Andrew Alicea, pulled up next to the Honda van in front of St. James Church at 135 Harrison

Avenue.  The Asian male driving the Honda, later identified as Target Subect Aibun Eng, who

appeared to have been waiting, got out, went to the driver's side window of the Lincoln, went

back to the Honda van, removed a dark colored bag (not the original piece of luggage from the

Defendant's Hummer) and got into the Lincoln.  The Lincoln then drove to an underground

parking garage on Oak Street.  After about five minutes, the Lincoln left the parking garage and

stopped next to the Honda van.  Eng returned to the Honda van without the black bag.  The

Lincoln and Honda van then both left. [Id., ¶ 97.]

      Boston Police Department officers next performed a "wall-off" traffic stop of the

Lincoln.  During the stop, officers searched the Lincoln and recovered approximately two

pounds of  marijuana and a firearm.  Alicea was arrested and, post-Miranda, said that he had just

gotten the weed from his friend that just got out of the car [Eng].   On the basis of that

information, BPD officers also stopped the Honda van, which was driven by Eng, arrested Eng, and found 53 extra large bags of marijuana, in excess of a total of 60 pounds, and the dark luggage that had started out in Defendant's Hummer.  Marijuana was found inside the dark luggage.  The McElroy Affidavit concluded that Alicea received marijuana from Eng, who had received it from the Defendant.  [Id., ¶¶ 98-99.]

Finally, the McElroy Affidavit offered additional facts to support its conclusion that the Defendant was engaged in drug dealing.  For example, the Defendant did not have a legitimate job.  Nevertheless, he had been observed during the preceding thirty days driving very expensive cars – a late model Mercedes, a Bentley, and a burgundy Hummer, which further corroborated CS-4 and which the Defendant could not afford with any legitimate source of income.  [Id., ¶ 13.]  In addition, in the two years prior to the Affidavit, the Defendant had a total buy-in at Foxwoods Casino of $329,485.  [Id., n. 13.]

2.      *Assault in Furtherance of Chen's Brothel Business*

The McElroy Affidavit also detailed a planned, violent assault by the Defendant against the people who had attacked an employee of Chen's brothel business,[3] which would have violated 18 U.S.C. § 1951(a)(2) (the "Travel Act").   On October 26, 2010, at 8:05 p.m., the FBI intercepted a call over target telephone between Chen and an Asian male whom he called "Ah-Wai," his employee in the brothel business.[4]   Ah-Wai said that he had been beaten by a Malaysian in the bathroom of a bar.  Chen said that Ah-Wai should have "John" [Willis, the

---

[3]The Defendant does not dispute the McElroy Affidavit's detailed descriptions of Chen's brothel business.

[4]Descriptions of and quotations from these and subsequent interceptions over target telephone 1, which were primarily in Cantonese, are based on translations by FBI linguists.

Defendant] beat up his attackers.  Ah-Wai did not think that John would answer his call.  Wei Chen said that he (Chen) would have someone beat up those people.  The McElroy Affidavit concluded that Chen was proposing the Defendant for an assault in retaliation for the beating of Ah-Wai, the brothel employee.  About two hours later, Chen placed three successive outgoing calls from target telephone 1 to the Defendant's telephone, target telephone 2.  Each call went to voicemail and Chen did not leave a message.  The McElroy Affidavit concluded that Chen was attempting to contact the Defendant to set up the assault in retribution for Ah-Wai's beating.  [Id., ¶¶ 64-65.]

On October 27, 2010, at 8:45 p.m., the FBI intercepted an outgoing call from Chen, using target telephone 1, which was tapped, to the Defendant on target telephone 2, which was not yet tapped.  In this call, Chen told Willis that his "kid," Ah-Wai, had been beaten by some Malaysian guys in Quincy the other day.  The Defendant said "What is his name?  I want to get the son of a bitch.  Where is he right now?"  Chen said that he [Ah-Wai] was "watching my shop [the brothel] for me today.  He, he, a few days earlier ... went to a Quincy Karaoke place and was beaten up."  Willis said, "Okay, who beat him up?  At this time, where is the person who beat him up?"  Chen said, "that kid, I don't know.  Only Ah-Wai, Ah-Wai knows.  Ask ... Ah-Wai to take you there.... Get him."  Willis said "Ask, call me, I want to find somebody, I want to get the son of a bitch."  Willis said that he would go see Ah-Wai in thirty minutes.  The McElroy Affidavit concluded that Chen had solicited the Defendant to assault the Malaysians in retribution for their beating of Wei Chen's employee and associate, Ah-Wai, and to send a message not to interfere with Chen's brothel business.  The McElroy Affidavit also concluded that the Defendant, especially by asking where the Malaysians could be found *right now*, by

7

saying that he wanted to get the son of a bitch, and by agreeing to see Ah-Wai, agreed to conduct

the assault and that the Defendant intended to commit the assault against the Malaysians to

further Chen's prostitution business, of which Ah-Wai was an employee. [Id., 71.]

The FBI observed additional activity in furtherance of the planned assault.  On October

28, 2010, at 3:38 p.m., the FBI intercepted a call between Chen and Ah-Wai.  In this

conversation, Ah-Wai asked if "John" [Willis, the Defendant] was there [at the brothel].  When

Chen said yes, Ah-Wai asked if the Chen had spoken to John about it.  Chen said that he had and

that Ah-Wai needed to take John there.  Ah -Wai said that he was coming.  The McElroy

Affidavit concluded that Ah-Wai and Chen were discussing the potential assault, which Chen

had discussed with the Defendant.  [Id., ¶ 73.]  That same day, surveillance agents observed the

Defendant, driving the same Bentley, arrive at the brothel at 185 Charles Street.  Agents saw The

Bentley depart 185 Charles Street at 4:45 p.m. [Id., ¶ 74.]

3.      *Collections of Debts By Extortionate Means*

Special Agent McElroy had included detailed information regarding the Defendant's

collection of debts by extortionate means in McElroy's October 7, 2010, affidavit in support of

the FBI's initial application to intercept wire communications over target telephone 1.  The

November 24, 2010, McElroy Affidavit incorporated the October 7 affidavit by reference.  The

incorporated facts included, for example, that on April 8, 2010, at 8:20 p.m., another cooperating

source ("CS-3") made a consensual recording of a conversation with Chen at his brothel.  CS-3

gave Chen (who was also a sports-bookmaker) $200 in FBI funds to settle CS-3's gambling debt.

CS-3 also asked Chen if Bac Guai ["White Devil"] John [Willis, the Defendant] was capable

with collecting [debts].  Chen said that "White Devil" John is capable but might not return the

money to the lender.  CS-3 asked Chen to get CS-3 the phone number for "White Devil" John.
[Affidavit of Special Agent Timothy C. McElroy, dated October 7, 2010, at ¶ 52.]  Chen's
description of the Defendant as a "capable" money-collector in this context supports the
reasonable inference that Defendant had collected debts for Chen and/or other criminals in the
past by extortionate means, in violation of 18 U.S.C. § 894.

> 4. *Use of Target Telephone 2*

The McElroy Affidavit demonstrated that the Defendant was using target telephone 2 in
general and in furtherance of his criminal activities.  That the Defendant was using target
telephone 2 was established by the Defendant's giving the telephone number, as his number, to
the Massachusetts State Police on October 20, 2010  (when Defendant was stopped carrying the
large amount of unexplained cash to Florida), and to Foxwoods personnel (when Defendant went
to the casino to gamble with unexplained cash).  [McElroy Aff., ¶ 15.]  That the Defendant was
using the telephone in criminal activity was established by his using target telephone 2 on
October 27, 2010, to talk with Chen about retaliating against the Malaysians who had attacked
Chen's brothel employee, and by Chen's using that telephone number several times in apparent
efforts to reach the Defendant to discuss the matter further and to set up a meeting between the
Defendant and the brothel employee who had been attacked, all in furtherance of Defendant's
violation of the Travel Act, as detailed above.  In addition, a review of pen register/trap and trace
data and toll records for target telephone 2 demonstrated that the phone was in contact with
Target Interceptee Brian Bowes, who, the McElroy Affidavit concluded, was the "Brian"
described by CS-4 as part of the oxycodone trafficking scheme; Target Interceptee Peter
Melendez, who was employed at an MRI clinic in Florida and lived with Bowes; and Target

Interceptee Kevin Baranowski.  The McElroy Affidavit concluded that all three were involved in the oxycodone trafficking scheme. [Id., ¶ 106A-C.]

II.     ARGUMENT

A.      Summary of Argument

The McElroy Affidavit made a more than minimally adequate showing of all the statutory requirements under 18 U.S.C. § 2518(1) for a wiretap order.  The Defendant's motion to suppress that wire is difficult to follow at times.  The Defendant's first argument, is captioned under 18 U.S.C. § 2518(1)(c), which section addresses the necessity requirement, but actually makes several, scatter-shot challenges to the probable cause for the McElroy's statement that the Defendant was committing Target Offenses.  Notwithstanding the Defendant's arguments, the issuing court appropriately found that the McElroy Affidavit stated sufficient facts to establish probable cause to believe that the Defendant was committing drug trafficking and Travel Act violations.  In making that finding, the issuing court justifiably relied, among other factual bases, on the information provided by CS-4.

The Defendant's second argument directly challenges the McElroy's Affidavit statement of necessity.  The issuing court correctly found that the McElroy Affidavit, which exhaustively categorized the investigative steps that the FBI had attempted and the success – or lack of success – of each, satisfied Title III's necessity requirement.

The Defendant makes an unsupported  request for a Franks hearing, which the Court should reject because of the Defendant's complete failure to make the required specific and substantiated preliminary showing of deliberate or reckless falsehood.

Finally, because the Defendant has based all of his arguments on the text of the written

affidavit, and all of his arguments are plainly without merit, the Court may, and should, deny the Defendant's motion without a hearing.

      B.    <u>Standard of Review</u>

The First Circuit has repeatedly asserted that a district judge reviewing a wiretap order should not apply a "rigid or rule-oriented" standard. <u>United States v. David</u>, 940 F.2d 722, 728 (1st Cir. 1991).   Rather, it should consider the government's affidavit in a "practical and commonsense" manner. <u>Id.</u> (quoting <u>United States v. Uribe</u>, 890 F.2d 554, 556 (1st Cir.1989)); <u>accord</u> <u>United States v. Scibelli</u>, 549 F.2d 222, 226 (1st Cir. 1977).   A reviewing court is "not to make a *de novo* determination of sufficiency as if it were a district judge, but to decide if the facts set forth in the application were *minimally adequate* to support the determination that was made." <u>United States v. Ashley</u>, 876 F.2d 1069, 1074 (1st Cir. 1989) (second emphasis added). This same minimally adequate standard "must be employed by the district court whenever the court 'is reviewing' the prior district court authorization of a wiretap application in the course of a suppression motion challenging the facial sufficiency of the affidavit." <u>Id.</u>; <u>accord</u> <u>United States v. Nelson-Rodriquez</u>, 319 F. 3d 12, 32 (1st Cir. 2003) (both district and circuit courts reviewing the original application use the "same metric to evaluate the action of the issuing judge").   This standard of review continues to apply in the First Circuit. <u>See, e.g.</u>, <u>United States v. Melendez-Santiago</u>, 644 F.3d 54, 56 (1st Cir. 2011); <u>United States v. Cartagena</u>, 593 F.3d 104, 109 (1st Cir. 2010).   Furthermore, the First Circuit has stated that the "minimally adequate" standard applies both to probable cause and necessity. <u>United States v. Yeje-Cabrera</u>, 430 F. 3d 1, 7 (1st Cir. 2005) (First Circuit has "long applied a unitary standard of review in 2518(1)(c)

cases"); but see United States v. Santana, 342 F.3d 60, 64 (1st Cir. 2003) (applying bifurcated standard).

The determination of probable cause "need not be tantamount to proof beyond a reasonable doubt." United States v. Hoffman, 832 F.2d 1299, 1306 (1st Cir. 1987)("Probable cause is determined under an objective standard … [p]robability is the touchstone … not a prima facie showing of criminal activity." (quoting United States v. Figueroa, 818 F.2d 1020, 1023-24 (1st Cir. 1987)). In fact, probable cause exists when the government demonstrates "in some trustworthy fashion" that there is some likelihood an offense has been or is being committed. Santana, 342 F.3d at 65 (citations omitted). The Supreme Court echoed this standard when the Court ruled that the "quanta of proof" applicable to a criminal trial do not apply to the decision to find probable cause and issue a warrant. Illinois v. Gates, 462 U.S. 213, 235 (1983).

     C.     The Government Made A More Than Adequate Showing Of Probable Cause.

The Defendant essentially attempts to pick apart the McElroy Affidavit, arguing at various times that the government's cooperating individual was not corroborated; that the government's evidence pertaining to the Defendant's role as the "enforcer" was insufficient to show probable cause; that the evidence of the Defendant's role in drug trafficking was too tenuous; and that the Defendant's legal gambling activity established nothing. Def.'s Mem. 10-13. The Defendant mischaracterizes some of the facts set forth in the McElroy Affidavit and "undertak[es] a piecemeal dismemberment of the various paragraphs of the affidavit without attention to its force as a whole." United States v. Leisure, 844 F.2d 1347, 1354 (8th Cir. 1988)(cited favorably by United States v. Salemme, 91 F. Supp. 2d 144, 374-75 (D. Mass. 1999), rev'd in part on other grounds sub nom., United States v. Flemmi, 225 F.3d 78 (1st Cir. 2000)).

12

Based on the "totality of the circumstances," the standard required by law, the McElroy Affidavit adequately stated probable cause to believe that, at a minimum, the Defendant was engaged in drug dealing and a Travel Act violation. See Gates, 462 U.S. at 231, 235.

       1.     *Drug Dealing*

The McElroy Affidavit's description of the Defendant's drug dealing begins with the reliable informant, CS-4's, statement that the Defendant was engaged in an oxycodone trafficking conspiracy.  As a general matter, "an officer may rely upon information received through an informant, rather than upon his direct observations, so long as the informant's statement is reasonably corroborated by other matters within the officer's knowledge." Gates, 462 U.S. at 242 (quotation marks omitted).  The determination of an informant's reliability "must be made in light of the totality of the circumstances." United States v. Brown, 500 F.3d 48, 54 (1st Cir. 2007); see also Gates, 462 U.S. at 230, 239 (replacing the rigid two-pronged *Aguilar-Spinelli* test with the totality-of-the-circumstances test).  An informant's trustworthiness and basis of knowledge are relevant considerations, but not dispositive. Gates, 462 U.S. at 229-30 (internal quotations omitted).  Ultimately, "all that the law requires is that, when all the pertinent considerations are weighed, the information reasonably appears to be reliable." Brown, 500 F.3d at 55.

The issuing court correctly found CS-4's information reliable.  First, the FBI knew CS-4's identity, which allows the government to hold it accountable for false information. See Brown, 500 F.3d at 54-55, citing Adams v. Williams, 407 U.S. 143, 146-47 (1972).  Second, CS-4 provided detailed information about the oxycodone conspiracy: the type and strength of the drug involved ("perc 30's"); the quantity (10,000 to 20,000); the means of acquiring the drugs

(obtaining prescriptions for 240 pills at a time); the manner of transport (paying people to fly from Florida to Boston); and at least one of the Defendant's conspirators ("Brian").  See Gates, 462 at 245 (giving weight to an informant's uniquely detailed account of the defendants' illegal drug-trafficking scheme); United States v. Barnard, 299 F.3d 90, 93 (1st Cir. 2002) ("The credibility of an informant is enhanced to the extent he has provided information that indicates first-hand knowledge.").   Finally, the FBI corroborated numerous points of CS-4's information, both regarding the Defendant himself (e.g., that the Defendant spoke Cantonese, and carried a counterfeit driver's license) and regarding the Defendant's drug dealing.  For example, the FBI corroborated the Defendant's association with Brian Bowes by pen register data and toll records. See United States v. Southard, 700 F.2d 1,7 (1st Cir. 1983) (informants' information was corroborated by, *inter alia*, telephone records).  In addition, the FBI confirmed that, as CS-4 had said, the Defendant, who lacked any known legitimate sources of income, was driving expensive cars and spending hundreds of thousands of dollars gambling at Foxwoods.  Defendant's spending, and being found to be carrying, large amounts of unexplained cash, supported the court's finding that there was probable cause to believe that the Defendant was involved in criminal activity.  United States v. Burgos, 254 F.3d 8, 15 (1st Cir. 2001) ("Evidence of large sums of unexplained cash is relevant to demonstrating an individual's involvement in illegal drug activities.  See United States v. Figueroa, 976 F.2d 1446, 1454 (1st Cir.1992); United States v. Newton, 891 F.2d 944, 948 (1st Cir.1989)").

Law enforcement made additional observations of the Defendant during the October 20, 2010, stop at Logan Airport as he attempted to board a flight to Ft. Lauderdale.  The Defendant was heading to Florida, the source of his drug supply, carrying over $13,000 in cash, which he

could not explain.[5]  CS-4's information and the circumstances of the stop easily provide probable cause that the Defendant was engaged in the oxycodone conspiracy alleged in the Affidavit.

As a completely separate crime, the McElroy Affidavit also demonstrated probable cause that the Defendant was also involved in marijuana trafficking on November 5, 2010.  In response, the Defendant argues that the connection between the Defendant and the drug deal was too attenuated.  Def.'s Mem. 12.  The Defendant's argument simply belies the facts.  Within the space of approximately two hours, law enforcement observed a piece of luggage go from the Defendant's car to Eng's car, where it was found to contain marijuana.  Moreover, during that same period of time, Eng actually delivered marijuana to Alicea.  Again, the standard here is probable cause; these facts -- even standing alone (as they are not in this case) -- would provide probable cause to believe that the Defendant was involved in marijuana trafficking.

      2.    *Travel Act Violation*

---

[5] The Defendant made the unsupported claim that "most, if not all, of the U.S. currency in circulation is contaminated and will result in a positive alert during a K-9 search."  Def.' Mem. at pp. 10-11.  The Defendant, however, is simply wrong about the science, and the state of the law, concerning K-9 drug searches.  The alleged background contamination of "all" U.S. currency is too slight for a dog to detect.  Trained drug-sniffing dogs alert to a stronger scent -- not of the drugs themselves, but to particular chemicals that are only present on currency which has recently been exposed to drugs.  See United States v. $30,670 in United States Funds, 403 F.3d 448, 462 (7th Cir. 2005) (scientific evidence establishes that dogs do not alert to the smell of cocaine but only to the smell of methyl benzoate, a volatile byproduct; thus, dogs do not alert to tainted currency in general circulation but only to currency that "has been exposed to large amounts of illicit cocaine within the very recent past"; accordingly, "a properly trained dog's alert to currency should be entitled to probative weight"); United States v. $22,474 in U.S. Currency, 246 F.3d 1212, 1216 (9th Cir. 2001) (because a properly trained drug dog alerts to the presence of methyl benzoate, a chemical by-product that evaporates quickly when exposed to the air, and does not alert to the cocaine itself, a dog alert means that the currency has been in recent proximity to cocaine).

The Defendant attempts to belittle the evidence of the Defendant's role as an "enforcer" by characterizing it as "some bravado." Def.'s Mem. 11. The Defendant misses the point of this evidence. The Defendant's use of target telephone 2 to talk with Chen about the Defendant's beating up people who had attacked Chen's brothel employee, and to take steps toward locating those people for that purpose, was in furtherance of a violation of the Travel Act that the Defendant was in the process of committing.[6] The Defendant said over the phone to Chen: " … I want to get the son of a bitch. Where is he right now?" The Defendant thereby used a facility in interstate commerce, i.e., target telephone 2; with the intent to commit a violent crime, i.e., an assault on the Malaysians that beat up Ah-Wai; to further unlawful activity, i.e., Chen's brothel business. Target telephone 2 constitutes a facility of interstate commerce, regardless of whether the call itself traveled across state lines. See United States v. Nader, 542 F.3d 713, 718-20 (9th Cir. 2008).[7]

---

[6]The Travel Act provides that "[w]hoever travels in interstate or foreign commerce or uses the mail or any facility in interstate or foreign commerce, with intent to ... commit any crime of violence to further any unlawful activity ... and thereafter performs or attempts to perform ... an act described in paragraph (2)" commits a crime. 18 U.S.C. 1952(a).

[7]The Defendant also used target telephone 2 to aid and abet Chen's violations of the Travel Act. "It is well established that a defendant who aids and abets the underlying unlawful activity violates the Travel Act, notwithstanding that he himself did not travel interstate." United States v. Crites, 2007 WL 172259 (D. R.I. 2007); accord U.S. v. LeFaivre, 507 F.2d 1288 (4th Cir. 1974) (finding "telephone girls" who received bets but did not actually "use" a facility in interstate commerce nonetheless aids and abets in the violation of the Travel Act). Here, the Defendant spoke with Wei Chen about the assault, which was to be committed in furtherance of protecting the integrity of Chen's brothel business. To staff his business, Chen made numerous interstate phone calls and hired women from out of state, including from New York and California. [McElroy Aff. ¶ 76, 77, 79.]

The conversation itself demonstrated the Defendant's intent to commit a crime of violence, i.e., the assault against the Malaysians.  Whether or not the crime of violence occurred makes no difference.  It is enough to show probable cause that an offense "is about to be committed."  18 U.S.C. § 2518(1)(b)(i); see Santana, 342 F.3d at 65.  Although the intercepted phone conversation between Chen and the Defendant itself did not complete the Travel Act offense, the subsequent intercepts referencing the Defendant speaking to Chen and meeting with Chen's employee to obtain more information about the attackers, so that the Defendant could track them down, and the surveillance observations that the Defendant was at the brothel shortly after the intercepted conversation, apparently for purposes of meeting with Chen's employee, demonstrate the Defendant's intent to complete the Travel Act offense by committing, or attempting to commit, the assault on the employee's attackers.

Finally, there is probable cause to believe that Defendant was intending to commit the assault on behalf of Chen and Chen's employee in furtherance of Chen's brothel business.  The assault would have furthered the prostitution business by protecting an employee of the business and enhancing Chen's reputation as someone who would strike back if anyone attacked his employees.  The Travel Act defines "unlawful activity" as including "any business enterprise involving ... prostitution offenses" in violation of a state law.  18 U.S.C. 1952(b).  Accordingly, the issuing court could also find probable cause that the Defendant was about to commit a violation of the Travel Act, and was using target telephone 2 to do so.

D.    The Government Made A More Than Adequate Showing Of Necessity.

The federal wiretap statute requires the government to include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why

17

they reasonably appear to be unlikely to succeed if tried or to be to be too dangerous." 18 U.S.C.

2518(1)(c).   In reviewing the wiretap affidavit, the issuing judge must determine on the basis of

the facts submitted that "normal investigative procedures have been tried and have failed or

reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C.

2518(3)(c).  Together, these requirements make up Title III's "necessity requirement." See Kahn

v. United States, 415 U.S. 143, 153 n.12 (1974).  The two sections together are designed to

ensure that a wiretap is not employed where "traditional" methods of investigation would

suffice.  Id.

The Defendant's argument that the government failed to satisfy the necessity requirement

in 2518(1)(c) basically centers around two arguments: (1) that the government did not pursue all

of the potentially fruitful investigative methods available to it and therefore did not exhaust all

"normal" strategies before resorting to a wiretap; and (2) that the affidavit simply employed the

"boilerplate language of Title III applications."   Def.'s Mem. 17.

1.    *The Government Need Not "Exhaust" All Other Investigatory Techniques or Prove that Traditional Techniques Were "Entirely Unsuccessful."*

The First Circuit has repeatedly held that the government is only required to "make a

reasonable, good faith effort to run the gamut of normal investigative procedure" before

requesting electronic surveillance.  Ashley, 876 F.2d at 1072 (quoting Hoffman, 832 F.2d at

1306).  The government need not "run outlandish risks" or "exhaust every conceivable

alternative" before applying for a wiretap.  Hoffman, 832 F.2d at 1306; see also United States v.

Villarman-Oviedo, 325 F.3d 1, 9 (1st Cir. 2003) ("It is not necessary … to show that other

methods have been entirely unsuccessful."); David, 940 F.2d at 729 ("An application for

electronic surveillance need not be based on proof positive that, without electronic assistance, a

promising investigation is up a blind alley.").

The Defendant argues that other "more fruitful" techniques were available to the government.  Def.'s Mem. 16.  Nevertheless, the Defendant points to neither *single* investigative technique that the FBI had failed to try nor a *single* technique that the FBI had tried, but had not tried for a long enough time.  "[T]here is no rule on the amount of time investigators must try and fail, using other methods, before turning to a wiretap application."  See Nelson-Rodriguez, 319 F. 3d 12, 33 (1st Cir. 2003); United States v. Cao, 471 F.3d 1, 3 (1st Cir. 2006) ("partial success" of traditional investigative techniques, "the wiretaps remained essential" due to the conspirators evasive techniques).

The McElroy Affidavit detailed the investigation's use or consideration of the following techniques: cooperating individuals, undercover agents, grand jury and administrative subpoenas, interviews of targets and witnesses, physical surveillance, telephone records and pen registers, search warrants, pole cameras, and the information derived from other criminal investigations.  [McElroy Aff. 64-78.]  The McElroy Affidavit also specifically detailed the particular challenges posed by the Defendant's criminal activity.  First, the Defendant had no set location and often frequented crowded areas such as Chinatown.  [Id. ¶ 135.]  Therefore, the Defendant was hard to find and difficult to follow.  Second, despite being unemployed and not having a valid driver's license, the Defendant had access to a number of expensive, fast vehicles, none of which was in his name, which made it difficult for investigators to locate the Defendant, or to keep up with Defendant once investigators had spotted him.  [Id. ¶¶ 12, 39, 74, 96, 100, 103.]  Third, the Defendant conducted at least some of his criminal business in Cantonese and with Asian organized crime figures, thereby insulating his criminal activity further.  See

Hoffman, 832 F.2d at 1307-08 (the First Circuit considered the targets' use of "coded" language or "tongues," as well as their "craftiness, circumspection and caution," when determining if the government set forth a sufficient showing of necessity.).  Moreover, drug conspiracies like the Defendant's, involving multiple players, multiple hand-offs, and interstate travel, by nature, often can be fully investigated and understood only via Title III interceptions.  See David, 940 F.2d at 729 ("High-stakes drug trafficking is by its nature volatile, fast-paced, elusive, and in constant motion ").  The court granting wiretap must view the application under the totality of the circumstances.

2.     <i>The Affidavit Contains More Than "Boilerplate Language."</i>

The Defendant also argues that the affidavit used only "the boilerplate language of Title III applications" to explain why electronic surveillance was necessary in this investigation. Def.'s Mem. 17. This argument is simply not accurate in this case, and similar arguments have repeatedly failed in the First Circuit.  There is no requirement that the government establish that its case is different from other, similar cases when it details its necessity to use wiretaps. See United States v. Martinez, 452 F.3d 1, 6 (1st Cir. 2006) ("Necessity is a function of the specifics of the case, not its uniqueness.  If [an investigation requires a wiretap, and] … the government establishes that necessity with the particulars of a given investigation, no more is needed."); see also Yeje-Cabrera, 430 F.3d at 9 (denying defendant's characterization of the affidavit as "boilerplate" when it contained concrete information that pertained to that specific investigation) (citing United States v. Lopez, 300 F.3d 46, 53-54 (1st Cir. 2002) (same)). Additionally, it is not uncommon for one wiretap affidavit to incorporate a previous application by reference. See id. (finding no flaws in the government's wiretap application that incorporated a previous affidavit

20

by reference, even though subsequent affidavits "overlap[ped] considerably" with first affidavit).

 Instead, when an affidavit sets forth more than mere assertions and includes fact-specific explanations as to why other traditional techniques will not work, the government provides sufficient information to enable the court to determine that normal investigative procedures "reasonably appeared unlikely to succeed." United States v. DiMuro, 540 F.2d 503, 511 (1st Cir. 1976) (quotation omitted).

       E.      The Defendant Is Not Entitled To A Hearing.

      A criminal defendant has no "absolute or presumptive right" to a hearing on a motion. United States v. Panitz, 907 F.2d 1267, 1273 (1st Cir. 1990) (citing cases).  Recognizing that "district courts are busy places and makework hearings are to be avoided," the First Circuit requires that the defendant make a substantive showing that material facts are in dispute or doubt. Id. (citations omitted).  Evidentiary hearings in criminal cases are "the exception, not the rule." United States v. Alicea, 205 F.3d 480, 487 (1st Cir. 2000).  Hearings are required on motions to suppress evidence "*only* where a defendant makes a sufficient showing that the evidence seized was the product of a *warrantless* search . . . .  The burden is on the defendant to allege facts sufficiently definite, specific, detailed, and nonconjectural, to enable the court to conclude that a substantial claim is presented." United States v. Calderon, 77 F.3d 6, 9 (1st Cir. 1996) (quotations omitted and emphasis added); accord United States v. D'Andrea, 648 F.3d 1, 5 (1st Cir. 2011) ("A hearing is required only if the movant makes a sufficient threshold showing that material facts are in doubt or dispute, and that such facts cannot reliably be resolved on a paper record.") (citation omitted); United States v. Brown, 621 F.3d 48, 57 (1st Cir. 2010) ("[E]videntiary hearings are only required when a defendant makes a sufficient showing that a

warrantless search has occurred.") (quotations omitted).

There is no reason to have a hearing here.  The Defendant limits his arguments to the four corners of the affidavit and does not identify any facts in dispute.  The Defendant's empty request for a Franks hearing does not avail him either, because the Defendant has failed to provide the Court with any concrete allegations of any deliberate or reckless misstatements or omissions in the McElroy Affidavit.  Franks v. Delaware held that a defendant becomes entitled to a "Franks hearing" only if he first makes a "substantial preliminary showing" that the affiant knowingly or recklessly included a false or misleading statement in the wiretap affidavit.  438 U.S. 154, 155-56 (1978).  A Franks hearing is not to be granted lightly, however, as wiretap affidavits carry a "presumption of validity."  Franks 438 U.S. at 171; Southard, 700 F.2d at 7.  The defendant must provide specific "allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof."  Franks 438 U.S. at 171.  If the defendant satisfies the first prong, the Court must then consider whether the falsities were necessary to the determination of probable cause.  Id. at 155-56.

This Court need not consider Franks' second prong, however, because the Defendant completely failed to state which portion of the affidavit he alleges to be false.  See id. at 171 (holding that a defendant must "point out specifically the portion of the affidavit that is claimed to be false").  The Defendant states that "[e]ven a cursory review of the unsupported statements and conclusions made by the affiant would establish the substantial preliminary showing that the affidavit contains intentional or reckless falsehoods and/or omissions."  Def.'s Mem. at 18.  But that statement itself is too "cursory" to satisfy Franks.  In contrast, the defendant in United States v. Young alleged eight particular misstatements contained in the government's affidavit for a

wiretap.  877 F.2d 1099, 1102-03 (1st Cir. 1989).  Although the First Circuit ultimately found all of the misstatements to be immaterial under the second prong of the Franks test, the Court at least had *something* to review for the purposes of the first prong.  Id. at 1102.  The Defendant here has provided not specifics at all, leaving it up to the Court to guess which portions of the 86-page affidavit are, he contends, allegedly false.

Defendant's conclusory assertion falls far short of satisfying the exacting standards mandated by Franks.  See, e.g., United States v. Higgins, 995 F.2d 1, 3 (1st Cir. 1993) (noting the difficulty for many defendants "to meet the exacting [substantial preliminary showing] standards of Franks").  Because the Defendant has failed to make the requisite "substantial preliminary showing" that the government deliberately or recklessly misled the Court in its application for the relevant wiretap, his motion should be denied without hearing.

III.      CONCLUSION

For the reasons stated above, the Court should deny the Defendant's motion to suppress without a hearing.

Respectfully submitted,
CARMEN M. ORTIZ
United States Attorney


 /s/ Timothy E. Moran
Timothy E. Moran
Richard L. Hoffman
Assistant United States Attorneys

Date: August 3, 2012

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

 /s/ Timothy E. Moran
Timothy E. Moran
Assistant United States Attorney

Date: August 3, 2012