UNITED STATES OF AMERICA
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO.  11-cr-10212-JLT |
| | ) | |
| 1.    JOHN WILLIS | ) | |
| 2.    BRANT WELTY | ) | |
| 3.    PETER MELENDEZ | ) | |
| 4.    AIBUN ENG | ) | |
| 5.    BRIAN BOWES | ) | |
| 6.    KEVIN BARANOWSKI | ) | |
| 7.    MICHAEL CLEMENTE | ) | |
| 12.   BRIDGET WELTY | ) | |
| 14.   COLBY DEERING | ) | |
| 15.   ANH NGUYEN | ) | |
| | ) | |
| Defendants. | ) | |

**UNITED STATES' MOTION FOR ORDERS OF FORFEITURE**

The United States of America, by its attorney, Carmen M. Ortiz, United States Attorney for

the District of Massachusetts, hereby moves that this Court issue a single Preliminary Order of

Forfeiture as to particular seized and restrained property, and separate criminal forfeiture money

judgment orders as to various defendants, all in accordance with Title 21, United States Code,

Section 853, Title 18 United States Code, Section 982(a)(1), Title 31, United States Code, Section

5317(c), Title 28, United States Code, Section 2461(c), and Rule 32.2(b) and (e) of the Federal Rules

of Criminal Procedure with respect to Defendants JOHN WILLIS, BRANT WELTY, PETER

MELENDEZ, AIBUN ENG, BRIAN BOWES, KEVIN BARANOWSKI, MICHAEL CLEMENTE,

BRIDGET WELTY, COLBY DEERING, and ANH NGUYEN (hereafter, collectively,

"Defendants"), for the reasons set forth below.

On May 26, 2011, a federal grand jury sitting in this District returned an Indictment (the

"Indictment") charging Defendants John Willis, Brant Welty, Peter Melendez, Aibun Eng, Brian

Bowes, Kevin Baranowski, Michael Clemente, and Bridget Welty, in Count One, with Conspiracy

To Distribute and Possess with Intent to Distribute Oxycodone, Marijuana, and Human Growth

Hormone, in violation of 21 U.S.C. § 846.

The Indictment contained a Drug Forfeiture Allegation, giving notice that upon conviction

of the offense charged in Count One, the defendants:

> jointly and severally, shall forfeit to the United States, pursuant to 21 U.S.C. §853: (1) any and all property constituting or derived from any proceeds obtained directly or indirectly as a result of the charged offense; and (2) any and all property used or intended to be used in any manner or part to commit and to facilitate the commission of the offense. The property to be forfeited includes, without limitation, the following:

a.      A money judgment equal to the total amount of gross drug proceeds.

b.      CRU Wine and Spirits, Inc., a Massachusetts corporation, operating at 1750-1752 Washington Street, Boston, Massachusetts, and all of its tangible and intangible assets, including, without limitation, all of its inventory, its cash on hand, its Retail Package Store All Alcoholic Beverages License, issued by the Commonwealth of Massachusetts Alcoholic Beverages Control Commission, and any leasehold or other interests it may have in its ground floor, basement, or other premises at 1750-1752 Washington Street, Boston, Massachusetts.

c.      9Five4 Nightclub Group, Inc., a Florida corporation, with a principal office address of 3101 N. Federal Hwy., 2nd Floor, Ft. Lauderdale, Florida 33306, and all of its tangible and intangible assets including, without limitation, all operating capital, licenses, leasehold and other real property interests, and rights of ownership, management, or control over any club, business, or business property, including, without limitation, all fixtures and other improvements to any such property.

d.      Approximately $98,473.00 in United States currency, seized by the Ridgeland, South Carolina, Police Department from Defendant MICHAEL SHAW and Defendant JOHN WILLIS (who falsely identified himself to police as Defendant BRANT WELTY) on or about February 10, 2011, on Route 95 in Ridgeland, South Carolina, turned over to the Drug Enforcement Administration for federal forfeiture, numbered for tracking purposes as asset No. 11-DEA-543937, and claimed on or about April 20, 2011, by Defendant MICHAEL SHAW via a false sworn statement submitted by SHAW to DEA Forfeiture Counsel.

e.      All funds contained in Citibank, N.A., Bank Account No. 9118178007, in the name of 9Five4 Nightclub Group, Inc.

f.      All funds contained in Bank of America, N.A., Account No. 009456972191, in the name of Brant Welty.

g.      All funds contained in Bank of America, N.A., Account No. 229036933786, in the name of Mike's Boat & Jet Ski Rental.

The forfeiture allegation also gave notice that if any of the property described as forfeitable, as a result of any act or omission of the defendants:

a.      cannot be located upon the exercise of due diligence;
b.      has been transferred to, sold to, or deposited with a third party;
c.      has been placed beyond the jurisdiction of this Court;
d.      has been substantially diminished in value; or
e.      has been commingled with other property which cannot be divided without difficulty;

the United States, pursuant to Title 21, United States Code, Section 853(p), intended to seek forfeiture of all other property of the defendants up to the value of the forfeitable property.

On July 10, 2012, defendant Peter Melendez pled guilty to Count One of the Indictment pursuant to a plea agreement with the government (Docket No. 246). The Court sentenced Melendez on September 25, 2012, to, among other penalties, 160 months' incarceration and criminal forfeiture. The criminal forfeiture orders entered by the Court and incorporated in Melendez's sentence include an order forfeiting the vessel "Double Down," which was subsequently forfeited to the United States after due notice (Docket No. 463), and a criminal forfeiture money judgment in the amount of $85,500.00 (Docket No. 367), which is still outstanding.

Between July 28, 2011, and July 19, 2012, the government filed forfeiture bills of particulars giving notice as to additional forfeitable assets, and the grand jury returned a first superseding indictment containing forfeiture allegations. The additional particular assets and bases for forfeiture bases set forth in these filings are encompassed by the Second Superseding Indictment described below.

3

On August 6, 2012, defendant Brian Bowes pled guilty to so much of Count One of the Indictment as charged conspiracy to distribute and possess with intent to distribute oxycodone in violation of 21 U.S.C. § 846 pursuant to a Rule 11(c)(1)(C) plea agreement with the government (Docket No. 288). Bowes has not yet been sentenced.

On August 16, 2012, the grand jury returned the Second Superseding Indictment, charging John Willis, Brant Welty, Michael Clemente, Bridget Welty, Colby Deering, and Anh Nguyen, in Count One, with conspiring to possess with intent to distribute and distribute oxycodone, in violation of 21 U.S.C. § 846, and in Count Two, with money laundering conspiracy, in violation of 18 U.S.C. § 1956(h). The Second Superseding Indictment also charged defendant Anh Nguyen, in Count Three, with witness tampering, in violation of 18 U.S.C. § 1512(b)(3).[1]

The Second Superseding Indictment contained a Drug Forfeiture Allegation, giving notice that upon conviction of Count One, the defendants:

> jointly and severally, shall forfeit to the United States, pursuant to 21 U.S.C. §853: (1) any and all property constituting or derived from any proceeds obtained directly or indirectly as a result of the charged offense; and (2) any and all property used or intended to be used in any manner or part to commit and to facilitate the commission of the offense. The property to be forfeited includes, without limitation, the following:
>
> a.  A forfeiture money judgment equal to the total amount of gross drug proceeds.
>
> b.  CRU Wine and Spirits, Inc., a Massachusetts corporation, operating at 1750-1752 Washington Street, Boston, Massachusetts, and all of its tangible and intangible assets, including, without limitation, all of its inventory, its cash on hand, its Retail Package Store All Alcoholic Beverages License, issued by the Commonwealth of Massachusetts Alcoholic Beverages Control Commission, and any leasehold or other interests it may have in its ground floor, basement, or other premises at 1750-1752 Washington Street, Boston, Massachusetts.

---

[1] Because Brian Bowes pled guilty, and Kevin Baranowski and Aibun Eng had agreed to plead guilty, before the grand jury returned the Second Superseding Indictment, they were not charged in it.

c.      9Five4 Nightclub Group, Inc., a Florida corporation, with a principal office address of 3101 N. Federal Hwy., 2nd Floor, Ft. Lauderdale, Florida 33306, and all of its tangible and intangible assets including, without limitation, all operating capital, licenses, leasehold and other real property interests, and rights of ownership, management, or control over any club, business, or business property, including, without limitation, all fixtures and other improvements to any such property.

d.      Approximately $98,473.00 in United States currency, seized by the Ridgeland, South Carolina, Police Department from Michael Shaw and Defendant JOHN WILLIS (who falsely identified himself to police as Defendant BRANT WELTY) on or about February 10, 2011, on Route 95 in Ridgeland, South Carolina, turned over to the Drug Enforcement Administration for federal forfeiture, numbered for tracking purposes as Asset No. 11-DEA-543937, and claimed on or about April 20, 2011, by Michael Shaw via a false sworn statement submitted by Shaw to DEA Forfeiture Counsel.

e.      All funds contained in, or seized on or about May 27, 2011, from, Citibank, N.A., Bank Account No. 9118178007, in the name of 9Five4 Nightclub Group, Inc.

f.      All funds contained in, or seized on or about May 27, 2011, from, Bank of America, N.A., Account No. 009456972191, in the name of Defendant BRANT WELTY.

g.      All funds contained in, or seized on or about May 27, 2011, from, Bank of America, N.A., Account No. 229036933786, in the name of Mike's Boat & Jet Ski Rental.

h.      Approximately $42,940.00 in United States currency, seized by the Dillon, South Carolina, Police Department from Defendant JOHN WILLIS (who falsely identified himself to police as Defendant BRANT WELTY) and Defendant BRANT WELTY, on or about March 24, 2011, on Route 95 in Dillon, South Carolina, turned over to the Drug Enforcement Administration for federal forfeiture, numbered for tracking purposes as Asset No. 11-DEA-545304, and claimed on or about May 25, 2011, by Defendant BRANT WELTY via a sworn statement submitted by Defendant BRANT WELTY to DEA Forfeiture Counsel.

i.      the following firearms, ammunition, and accessories, collectively identified for tracking purposes as Asset ID No. 11-FBI-005041, seized on May 27, 2011, from the Wormwood Street, Dorchester, apartment occupied by Defendants BRANT WELTY and BRIDGET WELTY:

Handguns, some with ammunition and/or magazines

Colt Diamondback .38 caliber revolver, s/n  D19274, determined to be untraceable by the ATF National Tracing Center;

Glock Model 19, 9 mm. pistol, s/n TE664US, with magazine and 13 rounds of ammunition;

Interarms Walther PPKIS .380 caliber pistol, s/n 5076186;

LW Seecamp California Edition .32 caliber pistol, s/n 046642, with 6 round magazine;

Sig Sauer Model SP2340 pistol, s/n SP0012952,  with 2 magazines containing 10 rounds each;

Smith & Wesson Model 640, .38 caliber revolver, s/n CEN4731;

Smith & Wesson Model 27, .357 caliber revolver, s/n N164836, reported stolen on about May 25, 2010, during a house break-in in Chester, Vermont;

Smith & Wesson Model 66, .357  caliber revolver, s/n 6K82887;

Smith & Wesson SW4OVE .40 caliber handgun, s/n RBT4168, with 2 magazines containing 10 rounds each, reported stolen on about October 19, 2010, from a residence in Stoneham, Massachusetts;

<u>Other Firearms</u>

Remington Model 870 12-gauge Shotgun, s/n A740380M;

DPMS Panther Arms A-15 Model rifle, s/n N0005955, with one magazine;

Uzi Model B 9 mm. rifle, s/n 65661, with 4 magazines, bag, and barrel;

<u>Other Ammunition</u>

75 rounds of .32 caliber ammunition;

2 boxes of Wolf brand .223 caliber rounds, totaling 40 rounds;

270 rounds of .38 caliber ammunition;

63 rounds of .357 caliber ammunition;

4 rounds of .40 caliber ammunition;

93 rounds of .40 caliber ammunition;

80 rounds of .380 caliber ammunition; and

138 Rounds of 9 mm. ammunition;

j.     US Armor body armor, s/n BA-US-61797003, reported stolen from a federal agent in Boston, and seized on May 27, 2011, from the Wormwood Street, Dorchester, apartment occupied by Defendants BRANT WELTY and BRIDGET WELTY;

k.     the following watches and jewelry seized on May 27, 2011, from the Wormwood Street, Dorchester, apartment occupied by Defendants BRANT WELTY and BRIDGET WELTY, and collectively identified for tracking purposes as Asset ID No. 11-FBI-004758:

Men's gold-tone Movado watch;

Men's 14k yellow gold overlay stainless steel Omega watch, Constellation model;

Men's stainless steel Baume & Mercier watch, Copeland Sport model 65366, s/n 5270762;

Men's stainless steel Tag Heuer watch with 11 single-cut diamond dot markers, model WJ1114-0, s/n YP7640;

Men's stainless steel Tag Heuer watch, model CT1110, s/n MZ9436;

Men's stainless steel & 18k yellow gold 8" bracelet; and

Ladies' 18k yellow gold cluster ring, with 10 full-cut diamonds and 1 dark blue sapphire;

l.     Red 2005 Hummer H2, Florida Registration No. AMX5239, VIN 5GRGN23U75H112523;

m.    Blue 2005 Bentley Coupe, Massachusetts Registration No. RS66PG, VIN SCBCR63W65C027444;

n.     Black 2008 Mercedes E350, Massachusetts Registration No. 518CT2, VIN WDBUF87X58B207614;

o.     Black 2005 American IronHorse Motorcycle, Massachusetts Registration No. 9X6771, VIN 5L5SJ144X51000005;

p.     Black 2006 Porsche Cayenne, Florida Registration No. AML5744, VIN WP1AC29P76LA92558;

q.    1998 Sea Ray 290 Sundancer; Vessel Number: SERT 3939 E898; Vessel Name: DOUBLE DOWN, seized from a boatyard in Dorchester, Massachusetts, on about September 23, 2011, together with all associated motors, engines, parts, attachments and accessories, whether or not attached to the vessel at time of seizure;

r.    Approximately $15,000 in U.S. currency paid to A Signature Only Bail Bonds, Inc., Fort Lauderdale, Florida, on about January 25, 2011, for issuance of a $150,000 release bond for arrested co-conspirator Steven Le;

s.    Approximately $20,300 in U.S. currency paid to Mercedes Benz of Fort Lauderdale, Fort Lauderdale, Florida, on about January 28, 2011, in connection with Defendant JOHN WILLIS's purchase of a 2008 Mercedes Benz SL550R on about January 29, 2011, for one of WILLIS's Florida girlfriends, "Jane Doe;"

t.    Approximately $150,000.00 in U.S. currency deposited into Citibank Account # 9118178007, held in the name of 9Five4 Nightclub Group, Inc.;

u.    Approximately $52,000.00 in U.S. currency transferred or deposited into a Bank of America Account ending in -0175 in the name of "Jilco, Inc.";

v.    Approximately $55,327.00 in United States currency seized on or about May 27, 2011, from the Dorchester apartment occupied by Defendants JOHN WILLIS and ANH NGUYEN, and identified for tracking purposes as Asset ID No. 11-FBI-004485;

w.    Various pieces of jewelry seized on or about May 27, 2011, from the Dorchester apartment occupied by Defendants JOHN WILLIS and ANH NGUYEN, and identified for tracking purposes as Asset ID No. 11-FBI-004487;

x.    2007 Suzuki GSXR10 motorcycle, Massachusetts Registration No. 7X8905, VIN # JS1GT77A172111260, seized on or about May 27, 2011, from the garage of the Dorchester apartment occupied by Defendant JOHN WILLIS and ANH NGUYEN, and identified for tracking purposes as Asset ID No. 11-FBI-4518; and

y.    Yamaha Jet Ski, Florida Registration No. MS9286AW, VIN or S/N YAMA2946A606, seized on or about May 27, 2011, from the premises of the Pompano Beach, Florida, home rented for Defendant JOHN WILLIS in the name of co-conspirator Peter Melendez[2] and identified for tracking purposes as Asset ID No.

---

[2] This Pompano Beach home, located at 2940 N.E. 23rd Court, Pompano Beach, Florida, was rented by John Willis in the name of Peter Melendez.  The Pompano Beach home served as the Florida base of operations for the oxycodone-trafficking and money laundering conspiracies from early March 2011 until most of the defendants were arrested on May 27, 2011.

11-FBI-3912.

The Second Superseding Indictment contained a Money Laundering Forfeiture Allegation, giving notice that upon conviction of Count Two, the defendants:

jointly and severally, shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 982(a)(1), all property, real and personal, involved in that offense, and all property traceable to such property. The property to be forfeited includes, without limitation, the following:

a.    a forfeiture money judgment in an amount equal to the value of all property involved in the offense.

b.    CRU Wine and Spirits, Inc., a Massachusetts corporation, operating at 1750-1752 Washington Street, Boston, Massachusetts, and all of its tangible and intangible assets, including, without limitation, all of its inventory, its cash on hand, its Retail Package Store All Alcoholic Beverages License, issued by the Commonwealth of Massachusetts Alcoholic Beverages Control Commission, and any leasehold or other interests it may have in its ground floor, basement, or other premises at 1750-1752 Washington Street, Boston, Massachusetts.

c.    9Five4 Nightclub Group, Inc., a Florida corporation, with a principal office address of 3101 N. Federal Hwy., 2nd Floor, Ft. Lauderdale, Florida 33306, and all of its tangible and intangible assets including, without limitation, all operating capital, licenses, leasehold and other real property interests, and rights of ownership, management, or control over any club, business, or business property, including, without limitation, all fixtures and other improvements to any such property.

d.    Approximately $98,473.00 in United States currency, seized by the Ridgeland, South Carolina, Police Department from Michael Shaw and Defendant JOHN WILLIS (who falsely identified himself to police as Defendant BRANT WELTY) on or about February 10, 2011, on Route 95 in Ridgeland, South Carolina, turned over to the Drug Enforcement Administration for federal forfeiture, numbered for tracking purposes as Asset No. 11-DEA-543937, and claimed on or about April 20, 2011, by Michael Shaw via a false sworn statement submitted by Shaw to DEA Forfeiture Counsel.

e.    All funds contained in or previously seized from Citibank, N.A., Bank Account No. 9118178007, in the name of 9Five4 Nightclub Group, Inc.

f.    All funds contained in Bank of America, N.A., Account No. 009456972191, in the name of Defendant BRANT WELTY.

g.      All funds contained in Bank of America, N.A., Account No. 229036933786, in the name of Mike's Boat & Jet Ski Rental.

h.      Approximately $42,940.00 in United States currency, seized by the Dillon, South Carolina, Police Department from Defendant JOHN WILLIS (who falsely identified himself to police as Defendant BRANT WELTY) and Defendant BRANT WELTY, on or about March 24, 2011, on Route 95 in Dillon, South Carolina, turned over to the Drug Enforcement Administration for federal forfeiture, numbered for tracking purposes as Asset No. 11-DEA-545304, and claimed on or about May 25, 2011, by Defendant BRANT WELTY via a sworn statement submitted by Defendant BRANT WELTY to DEA Forfeiture Counsel.

i.      Red 2005 Hummer H2, Florida Registration No. AMX5239, VIN 5GRGN23U75H112523;

j.      Blue 2005 Bentley Coupe, Massachusetts Registration No. RS66PG, VIN SCBCR63W65C027444;

k.      Black 2008 Mercedes E350, Massachusetts Registration No. 518CT2, VIN WDBUF87X58B207614;

l.      Black 2005 American IronHorse Motorcycle, Massachusetts Registration No. 9X6771, VIN 5L5SJ144X51000005;

m.      Black 2006 Porsche Cayenne, Florida Registration No. AML5744, VIN WP1AC29P76LA92558;

n.      1998 Sea Ray 290 Sundancer; Vessel Number: SERT 3939 E898; Vessel Name: DOUBLE DOWN, seized from a boatyard in Dorchester, Massachusetts, on September 20, 2011, together with all associated motors, engines, parts, attachments and accessories, whether or not attached to the vessel at time of seizure;

o.      Approximately $15,000 in U.S. currency paid to A Signature Only Bail Bonds, Inc., Fort Lauderdale, Florida, on about January 25, 2011, for issuance of a $150,000 release bond for arrested co-conspirator Steven Le;

p.      Approximately $20,300 in U.S. currency paid to Mercedes Benz of Fort Lauderdale, Fort Lauderdale, Florida, on about January 28, 2011, in connection with Defendant JOHN WILLIS's purchase of a 2008 Mercedes Benz SL550R on about January 29, 2011, for one of WILLIS's Florida girlfriends, "Jane Doe;"

q.      Approximately $150,000.00 in U.S. currency deposited into Citibank Account # 9118178007, held in the name of 9Five4 Nightclub Group, Inc.

r.    Approximately $52,000.00 in U.S. currency transferred or deposited into a Bank of America Account ending in -0175 in the name of "Jilco, Inc.";

s.    Approximately $55,327.00 in United States currency seized on or about May 27, 2011, from the Dorchester apartment occupied by Defendants JOHN WILLIS and ANH NGUYEN, and identified for tracking purposes as Asset ID No. 11-FBI-004485;

t.    Various pieces of jewelry seized on or about May 27, 2011, from the Dorchester apartment occupied by Defendants JOHN WILLIS and ANH NGUYEN, and identified for tracking purposes as Asset ID No. 11-FBI-004487;

u.    2007 Suzuki GSXR10 motorcycle, Massachusetts Registration No. 7X8905, VIN # JS1GT77A172111260, seized on or about May 27, 2011, from the garage of the Dorchester apartment occupied by Defendants JOHN WILLIS and ANH NGUYEN, and identified for tracking purposes as Asset ID No. 11-FBI-4518; and

v.    Yamaha Jet Ski, Florida Registration No. MS9286AW, VIN or S/N YAMA2946A606, seized on or about May 27, 2011, from the premises of the Pompano Beach, Florida, home rented for Defendant JOHN WILLIS in the name of co-conspirator Peter Melendez and identified for tracking purposes as Asset ID No. 11-FBI-3912.

The Second Superseding Indictment also contained a Witness Tampering Proceeds Forfeiture Allegation, giving notice that upon conviction of Count Three, defendant Anh Nguyen shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), any and all property, real and personal, which constitutes or is derived from proceeds traceable to the charged violation of 18 U.S.C. § 1512(b)(3).

Each of the forfeiture allegations in the Second Superseding Indictment also gave notice that if any of the forfeitable property described in the allegations, as a result of any act or omission of the defendants:

(a) cannot be located upon the exercise of due diligence;
(b) has been transferred or sold to, or deposited with, a third party;
(c) has been placed beyond the jurisdiction of the Court;
(d) has been substantially diminished in value; or
(e) has been commingled with other property which cannot be subdivided without difficulty;

the United States intended to seek forfeiture of any other property of the defendants up to the value of the forfeitable property pursuant to, among other statutes, 21 U.S.C. § 853(p), which is incorporated into all criminal forfeiture statutes by 28 U.S.C. § 2461(c).

On August 21, 2012, defendant Kevin Baranowski pled guilty to Count One of the Indictment pursuant to a plea agreement with the government (Docket No. 310).  On December 3, 2012, the Court sentenced Baranowski to, among other penalties, 80 months' incarceration and criminal forfeiture.  The criminal forfeiture order entered by the Court and incorporated in Baranowski's sentence was a criminal forfeiture money judgment in the amount of $10,500.00 (Docket No. 425), which is still outstanding.

On March 12, 2013, defendant Anh Nguyen pled guilty to Count Three of the Second Superseding Indictment, which charged witness tampering in violation of 18 U.S.C. § 1512(b)(3), pursuant to a Rule 11(c)(1)(B) plea agreement with the government (Docket No. 533).

On March 14, 2013, defendant John Willis pled guilty to Counts One and Two of the Second Superseding Indictment.  Willis pled "straight up," without a plea agreement.

On March 20, 2013, defendant Michael Clemente pled guilty to Count One of the Second Superseding Indictment, pursuant to a Rule 11(c)(1)(B) plea agreement with the government (Docket No. 569).

On March 21, 2013, defendant Brant Welty pled guilty to Counts One and Two of the Second Superseding Indictment.  Brant Welty pled "straight up," without a plea agreement.  In connection with Brant Welty's guilty plea, the parties filed a limited Stipulation Regarding Forfeiture Money Judgment Amount containing their agreement only as to the amount of the forfeiture money judgment that the government would seek against him, but not as to other forfeiture issues, including

which particular property was directly forfeitable, which property would be forfeited as substitute assets, and which property, if any, the parties might agree should be returned to Brant Welty (Docket No. 572).

On March 26, 2013, defendant Bridget Welty pled guilty to Count One of a Superseding Information (Docket No. 570) charging her with structuring, in violation of 31 U.S.C. § 5324(a), pursuant to a Rule 11(c)(1)(B) plea agreement with the government (Docket No. 568).

On April 8, 2013, defendant Aibun Eng pled guilty to so much of Count One of the Indictment as charged conspiracy to distribute and possess with intent to distribute marijuana in violation of 21 U.S.C. § 846, pursuant to a Rule 11(c)(1)(B) plea agreement with the government (Docket No. 521).

On April 29, 2013, after a jury trial, defendant Colby Deering was found guilty of Counts One and Two of the Second Superseding Indictment (Dockets Nos. 662, 667).

All of the plea agreements included forfeiture provisions and waivers of rights to contest forfeiture as to all other seized property, with some specific exceptions which will be addressed later as to particular defendants. For the reasons set forth below, forfeiture is mandatory as to all defendants, including John Willis and Brant Welty, who pled "straight up," and Colby Deering, who was convicted after trial.

## **Criminal Forfeiture**

Criminal forfeiture is a mandatory part of the sentence imposed upon a convicted defendant to whom a forfeiture statute applies. *See United States v. Monsanto*, 491 U.S. 600, 607 (1989) ("Congress could not have chosen stronger words to express its intent that forfeiture be mandatory in cases where the statute applied…"); *Libretti v. United States*, 516 U.S. 29, 38-39 (1995)

(forfeiture is part of sentence imposed following conviction, not a separate substantive offense).[3]

## Forfeitable Property

The applicable criminal forfeiture statutes apply broadly to all property within their scope.

The drug forfeiture statute, 21 U.S.C. § 853(a), extends to all property constituting or derived from any proceeds obtained directly or indirectly as the result of the drug trafficking offense of conviction (the Count One conspiracy), and all property used, or intended to be used, "in any manner or part," to facilitate the commission of that offense. 21 U.S.C. §§ 853(a)(1) & (2). As to all defendants convicted of Count One, there is a rebuttable presumption that any property of those defendants is subject to forfeiture as proceeds of the offense if the United States establishes by a preponderance of the evidence that such property was acquired by the defendants during the existence of the drug-trafficking conspiracy or within a reasonable time afterwards, and that there was no likely source for such property other than the offense of conviction. 21 U.S.C. § 853(d).[4]

---

[3] Because *Libretti* is still controlling law, and because criminal forfeiture statutes are indeterminate, typically calling for forfeiture of "any" or "all" proceeds and other property within the scope of the statute, not subject to any statutory maximum amount, all courts of appeals that have considered the issue have held that the courts' authority to decide forfeiture issues by a preponderance of the evidence has survived *Booker, Blakely and Apprendi*. *See, e.g., United States v. Ortiz-Cintron*, 461 F.3d 78, 82 (1st Cir. 2006) (until and unless Supreme Court overturns *Libretti*, lower courts must hold that Sixth Amendment does not apply to criminal forfeiture). In *Booker*, the Supreme Court also singled out criminal forfeiture as one of the aspects of sentencing that was not affected by its holding. *See Booker v. United States*, 543 U.S. 220, 258-259 (2005) (Opinion of Breyer, *J*.) (citing 18 U.S.C. "§ 3554 (forfeiture)" as one of several portions of the sentencing statutes that are still "perfectly valid"). There is a limited statutory right, in cases tried to a jury, for either party to request that the jury, after voting to convict a defendant, be retained to decide certain forfeiture issues. Fed. R. Crim. P. 32.2(b)(5). However, in this case, the only defendant convicted by a jury, Colby Deering, elected to have his forfeiture issues decided by the Court.

[4] Pursuant to an *ex parte* court order, the government has obtained tax records for the defendants indicating that none of them (and none of their drug-funded corporations) reported legitimate incomes sufficient to justify their huge expenditures of money during the charged

The money laundering forfeiture statute, 18 U.S.C. § 982(a)(1), applies to all property, real or personal, "involved in" the money laundering conspiracy charged in Count Two, and all property traceable to such property.  The broad term "involved in" comprises both the property that is the subject of the laundering and any property that facilitates the laundering process.

The structuring forfeiture statute applicable to Bridget Welty, 31 U.S.C. 5317(c), patterned after the money laundering forfeiture statute, requires forfeiture of all property, real or personal, involved in the offense and any property traceable thereto.

All of these criminal forfeiture statutes further authorize the United States to forfeit as "substitute" property" under 21 U.S.C. § 853(p) (emphasis added), "*any other property of the defendants*" (*i.e.*, including property of the defendants which has no connection at all to their criminal conduct) up to the total value of the directly forfeitable gross drug proceeds, facilitating property, and property involved in money laundering that is no longer available for forfeiture.  A large portion of the directly forfeitable property in this case is no longer available for forfeiture because the defendants transferred the property (including, but not limited to, the oxycodone conspiracy's gross cash drug proceeds, to third parties in furtherance of the two conspiracies.

Defendants transferred a large portion of their gross drug proceeds to others during the conspiracies to buy new supplies of oxycodone pills (and other illegal drugs); to pay for transporting themselves, money, and drugs between Boston and Fort Lauderdale by air and other means; to buy and operate their frequently replaced cell phones; to rent hotel rooms to conduct exchanges of drugs and money; to rent vehicles to transport themselves, drugs, and money; to lease luxurious homes and

---

conspiracies.  If this issue is contested, the government will offer these tax materials as evidence in connection with the defendants' sentencings, including any related criminal forfeiture proceedings.

apartments for themselves and others; to invest in businesses, including Cru Wine & Spirits, Inc., and 9Five4 Nightclub Group, Inc.; to attempt to purchase additional assets, including other luxury cars and a Fort Lauderdale nightclub; and to pay the high costs of living wealthy drug-funded lives filled with "wine, women, and song."  *See United States v. Hall*, 434 F.3d 42, 59 (1st Cir. 2006). Under Section 853(p), the United States is entitled to forfeit substitute property of the Defendants up to the value of all of this no longer available illicit wealth.

All of the particular property listed in the proposed Preliminary Order of Forfeiture submitted with this motion is forfeitable to the United States because, more likely than not, (a) the property constitutes, or is derived from oxycodone-trafficking proceeds; (b) the property was used, in some "manner or part," to facilitate the oxycodone-trafficking conspiracy; (c) the property was involved in the Count Two money laundering conspiracy; and/or (d) the property belongs to one or more of the convicted Defendants and is forfeitable as substitute property in lieu of the large portion of the directly forfeitable gross drug-trafficking proceeds that is currently unavailable for forfeiture because the defendants spent it during the conspiracies.

<u>Stolen Property</u>

As stated in the forfeiture allegations, two of the firearms seized on May 27, 2011, from Brant Welty's gun safe and the body armor seized from Brant and Bridget Welty's apartment had been stolen from their lawful owners.  These items are included in the Preliminary Order of Forfeiture for the purpose of extinguishing any claims of ownership the Defendants might otherwise have made to these items.  The last known  lawful owners of these stolen items, including the Smith & Wesson Model 27 .357 caliber revolver, s/n N164836, reported stolen on about May 25, 2010, during a house break-in in Chester, Vermont; the Smith & Wesson SW4OVE .40 caliber handgun,

16

s/n RBT4168, with 2 magazines, reported stolen on about October 19, 2010, from a residence in Stoneham, Massachusetts, and the US Armor body armor, s/n BA-US-61797003, reported stolen from a federal agent in Boston, will be notified of the Preliminary Order of Forfeiture and invited to submit claims for the items, in which they verify that they are the true and lawful owners of the items. Upon receipt of such verified claims, the Marshals Service will return the items to the lawful owners.

<u>Bases for Forfeiting Seized Firearms, Firearm Magazines, and Ammunition</u>

The firearms, firearm magazines, and ammunition seized in connection with the investigation of this case, including the firearm, magazines, and ammunition seized from the conspiracy's Pompano Beach home; the firearm, magazine, and ammunition seized from Brian Bowes incident to his arrest; and the large collection of firearms, magazines, and ammunition seized from the Wormwood Street apartment shared by Brant and Bridget Welty, are forfeitable to the United States on several grounds. First, they facilitated the drug trafficking conspiracy, or were intended to facilitate the conspiracy, in "some manner or part" by providing a means of protecting the conspiracy's tens of thousands of oxycodone pills and hundreds of thousands of dollars in oxycodone-trafficking proceeds. Second, they were involved in the money laundering conspiracy because they provided a means of protecting the drug proceeds which were the subject of the laundering conspiracy. Third, the firearms, magazines, and ammunition purchased during the life of the conspiracy (including, at least, two stolen handguns and an A-15 military-style rifle seized from Brant Welty) were likely purchased with drug-trafficking proceeds. Fourth, in any event, these items (except for the stolen ones) are property of the convicted defendants and therefore forfeitable as substitute property.

Some of the firearms, magazines, and ammunition (a substantial portion of which was found already loaded into firearms or magazines) were actually carried in furtherance of the oxycodone-trafficking and money laundering conspiracies.   All of them were possessed during and in furtherance of the conspiracies.  Several witnesses saw John Willis (a convicted felon) in possession of firearms during the conspiracies, both in Boston and in Florida.  Witnesses saw Brian Bowes carrying a firearm during the drug-trafficking conspiracy.  The firearm seized from the Pompano Beach, Florida, home used as a base of operations by the conspiracies would have been readily accessible to Willis, Peter Melendez, and other conspirators to defend their large quantities of drugs and drug proceeds.

Defendant Brant Welty had a Massachusetts license to carry concealed firearms, acquired during Welty's previous legitimate employment.  That license was still in effect while Brant Welty was participating as John Willis's right-hand man in the oxycodone-trafficking and money laundering conspiracies.  Just as Brant Welty served as the public, legitimate-appearing, face of the conspiracies in other ways, Brant Welty's firearms license enabled him to acquire and continue to possess a large number of firearms and firearms magazines, and a large quantity of ammunition, during and in furtherance of the conspiracies.

During the post-arrest search of the Wormwood Street, South Boston, apartment where Brant Welty and Bridget Welty lived, investigators found the large collections of firearms, magazines, and ammunition and the stolen set of body armor described in the Second Superseding Indictment's drug forfeiture allegations, and an additional partially loaded 31-round 9 mm. firearms magazine which is also covered by this motion.  Brant Welty had acquired several of the firearms legally, before he began participating in the two charged conspiracies and began conducting drug and money

18

exchanges in the same Wormwood Street apartment where he kept all of these items.  However, Welty acquired his two stolen pistols and his A-15 military-style rifle during the conspiracies.  He possessed all of these firearms, magazines, and ammunition, and kept them readily available for use, during the conspiracies in his Wormwood Street apartment, where Brant Welty and his sister frequently conducted the conspiracies' business.  Numerous high-value oxycodone shipments were delivered, and thousands of oxycodone pills and hundreds of thousands of dollars in cash drug proceeds were counted and exchanged in that apartment with Welty's firearms, magazines and ammunition close at hand.  Several of Welty's firearms magazines were loaded with ammunition at the time of seizure, indicating that they were being kept ready for immediate use by him and/or other conspirators if the need arose. The knowing possession of firearms and ammunition in close proximity to drugs and drug-trafficking is a basis for charging additional criminal offenses and enhancing criminal sentences.[5]  *A fortiori*, it is a basis for forfeiting the firearms, firearms magazines, and ammunition at issue here.

       Brant Welty's large cache of firearms, magazines, and ammunition, in addition to protecting

---

[5] *See United States v. Paneto*, 661 F.3d 709, 716-718 (1st Cir. 2011) (firearm is possessed "in connection with" drug trafficking, for purposes of 4-level sentencing enhancement under USSG § 2K2.1(b)(6), if firearm facilitates or *has the potential to* facilitate drug trafficking; connection sufficiently shown where firearm is found "in close proximity" to drugs; affirming enhancement based on unloaded firearm found in locked gun safe "in the same small single-floor apartment" as small quantity of cocaine);  *cf. United States v. Howard*, 687 F.3d 13, 18-21 (1st Cir. 2012) (constructive possession, which may be joint, sufficient to support conviction for possessing firearm in furtherance of drug-trafficking in violation of 18 U.S.C. § 924(c); firearm discovered in same room as some drugs, and close to another room where additional drugs were found); *United States v. Alverio-Melendez*, 640 F.3d 412, 420 (1st Cir. 2011) (affirming conviction for aiding and abetting a § 924(c) offense; gun "need not be present at the moment that drugs are verified, or at the moment that money or drugs change hands, in order to be possessed in furtherance of a drug trafficking crime.  Possession of a firearm 'to protect drugs or sales proceeds' can constitute possession in furtherance of a drug trafficking crime.") (quoting *United States v. Morin*, 523 F.3d 24, 27 (1st Cir. 2008)).

the oxycodone conspiracy's drugs and drug proceeds, also facilitated both conspiracies in another significant way.  Brant Welty's Massachusetts license to carry concealed firearms, his pre-conspiracy firearms collection, and his gun safe, collectively, facilitated the drug and money laundering conspiracies by cloaking with apparent legitimacy Welty's, and therefore, the conspiracies', acquisition and possession of *unlawfully* acquired firearms, as well as Welty's, and therefore the conspiracy's, unlawful actual and constructive possession of firearms -- whether legitimately acquired or not -- in the course of and in furtherance of these criminal conspiracies.

Other conspirators were aware of Brant Welty's gun collection.  Witness Anevay Duffy was present in the Weltys' apartment for a pill and money exchange when she saw convicted felon, John Willis, Brant Welty's "brother," handling and admiring one of Brant Welty's long guns.  Because Welty's A-15 military-style rifle was purchased from a gun store in Weymouth on November 11, 2010, during the conspiracies, and while John Willis was still in Boston, it was most likely that newly acquired rifle which Duffy saw Willis handling and admiring in the Weltys' apartment on this occasion.  Circumstantial evidence, which was described at length in the United States' Second Response to Pretrial Motions (Docket No. 602) at 2-7, also indicates that Colby Deering was likely involved in obtaining for the conspiracy the .40 caliber handgun that was stolen from Stoneham, Massachusetts, in October 2010 and then was found on May 27, 2011, in Brant Welty's gun safe.[6]

<u>Assets Not Included in Proposed Order</u>

Several of the assets listed in the forfeiture allegations have already been forfeited either in this criminal case or via uncontested administrative process.  Other previously listed assets have

---

[6] The Court granted Deering's motion in limine to exclude this firearm evidence, so it was not offered at trial.

been determined to be of no value, or of such limited value that forfeiture is not warranted.  Such previously forfeited and limited-value assets do not appear in the proposed Preliminary Order of Forfeiture.

Assets Seized from CRU Premises

Rather than seeking to forfeit, *per se*, the defendants' corporations which were specified in the forfeiture allegations, the government in the proposed Preliminary Order of Forfeiture seeks instead to forfeit only certain assets seized from the premises of one such corporation, Cru Wine & Spirits, Inc. ("Cru"), located at 1750-1752 Washington Street  in Boston's South End, where the Defendants operated the Cru liquor store.  Such assets include the Cru liquor license and the inventory of wine and liquor seized from Cru's premises on May 27, 2011.  These assets have been identified for forfeiture purposes, respectively, as Assets Nos. 11-FBI-004540 (liquor license), and 11-FBI-003952 (seized inventory of wine and liquor).  They are forfeitable because they (and Cru itself) were funded by drug proceeds, were used or intended to be used to facilitate the oxycodone-trafficking conspiracy, and/or were involved in the money laundering conspiracy.

On March 8, 2011, John Willis and Brant Welty had an intercepted telephone conversation about Willis's needing money for, among other things, monthly payments on the Bentley Continental (purchased and financed by Willis in Colby Deering's name) and payments due to the closing attorney for the Fort Lauderdale nightclub that Willis and Welty were in the process of purchasing through their other corporation, 9Five4 Nightclub Group, Inc.  Willis told Welty that he didn't have the money, everything was "fucked up" now, the lawyer working on the nightclub purchase wanted $7,500, and Willis had already put $10,000 into the nightclub project.  Willis asked Welty if there was any money in the Cru liquor store.  Welty responded that the liquor store was not

making a profit and that he was building up inventory.  Willis asked Welty why did they have it [the store] if it was not making any money.  Welty said that the store had $70,000 in inventory right then. Willis said that he had given Welty $70,000 [in drug trafficking proceeds] for the store.  Brant Welty did not disagree with Willis on this point, but responded that Willis had given Welty the money a little at a time, not all in one lump sum, so there was no lump of cash readily available for Welty to send down to Willis from the liquor store on this occasion.

The investigation revealed that in addition to funding Cru with drug proceeds, the conspirators also used the Cru premises as a meeting place, a place to store and transfer drug proceeds, and on at least one occasion, a place to count oxycodone pills.  As indicated by other intercepted telephone calls between John Willis and Brant Welty, Willis (who at the time was pretending to be Brant Welty) also gave the legitimate-appearing Cru address to police in Ridgeland, South Carolina, when they seized $98,473.00 in cash drug proceeds from Willis and co-conspirator Michael Shaw on April 20, 2011.

<u>Additional Seized Assets Encompassed by Proposed Order</u>

The following seized assets, which are forfeitable on one or more of the previously stated grounds, but which were not previously specified in the forfeiture allegations, have been included in the proposed Preliminary Order of Forfeiture:

Seized Items Nos. 1B13 and 1B14 (seized on May 27, 2011, from defendant Brian Bowes incident to his arrest in Florida):  Glock Semi-Auto 9 mm. Handgun Model 26, S/N: KPE731, a firearms magazine with 8 rounds of .40 caliber ammunition, and 9 rounds of  9 mm. ammunition;

Seized Items Nos. 1B68 and 1B69 (seized on May 27, 2011, from the Pompano Beach home then serving as the conspiracies' Florida home base):  Sig Sauer P226 .40 caliber pistol, S/N:

UU613193, and two (2) Sig Sauer .40 caliber magazines with 24 Rounds of ammunition;

Seized Items Nos. 1B72, 1B73, 1B75, and 1B78 (seized on May 27, 2011, from the conspiracies' Pompano Beach Home):   a total of approximately $2,026.00 in U.S. Currency (comprising Items 1B72 ($25.00), 1B73 ($1200.00), 1B75 ($254.00), and 1B78 ($547.00));

Seized Item No. 1B94 (seized on May 27, 2011, during the search of the Park Street, Dorchester, apartment occupied by John Willis and Anh Nguyen), comprising various watches and jewelry including:  One woman's  platinum band ring with approximate 3k round diamond stone; One woman's white gold ring with approximately 1k in diamonds imbedded in band; One diamond encrusted necklace with two solitaire diamond pendants; One diamond earring; One silver and diamond colored hoop earring; One pair of diamond and sapphire colored earrings; One woman's clustered diamond ring; One woman's 2k diamond ring with diamond chip band; One man's  black and silver  Invicta 1959 Diver watch with inscription on the back: "Between the devil and the deep blue sea come hell or high water"; One man's black strapped with diamond face "Hublot" watch with inscription on the back "BigBang" and the number "301RX"; One man's Jacob and Co. watch with black strap and diamond face, which shows time for multiple time zones); One man's Breitling silver strap watch with black face; One woman's Skagen watch with silver strap and silver face; One man's silver colored bracelet (looks like bicycle chain); and One man's silver colored necklace (looks like bicycle chain);[7]

---

[7] The government has agreed to return to Anh Nguyen, through her counsel, four jewelry items which Nguyen asserts were part of her deceased aunt's estate.  The government believes the four items are likely included in Seized Item 1B94, but is awaiting final confirmation from Anh Nguyen, through her counsel, as to which four items are to be returned.  Once the four particular items have been identified as being included either in Seized Item 1B94, or in the other seized jewelry list identified in the forfeiture allegations and the proposed Preliminary Order of Forfeiture as Asset ID No. 11-FBI-004487, the parties will file a separate motion and

Seized Item 1B118 (seized on May 27, 2011, from the Wormwood Street apartment occupied by Brant Welty and Bridget Welty):  $500 in U.S. Currency;

Unnumbered item seized on May 27, 2011, from the Wormwood Street apartment occupied by Brant Welty and Bridget Welty:  31-round 9 mm. magazine with one (1) round of 9 mm. ammunition;

Seized Items 1B154 through IB157 and 1B396 (seized on May 27, 2011, from the premises of Cru Wine & Spirits, Inc.):   a total of approximately $979.25 in U.S. Currency (comprising Items 1B154 ($45.00), 1B155 ($187.00), 1B156 ($18.00), 1B157 ($18.00), and 1B396 ($711.25)); and

The White 2000 Honda Odyssey, Massachusetts Registration No. N19060, VIN 2HKRL1866YH590541, seized from Aibun Eng on about May 27, 2011.

### Post-Sentencing Forfeiture Orders (Melendez and Baranowski)

As noted above, Defendants Peter Melendez and Kevin Baranowski have already been sentenced by the Court, and forfeiture orders, including criminal forfeiture money judgments, have been entered against them and incorporated into their sentences.  However, under Fed. R. Crim. P. 32.2(e), on the government's motion, the Court may "at any time" enter an order of forfeiture, or amend an existing order of forfeiture, to include either property subject to forfeiture under an existing order of forfeiture which was located and identified after the existing order was entered, or substitute property that qualifies for forfeiture under an applicable statute, such as 21 U.S.C. § 853(p), which authorizes forfeiture of substitute assets in this case.

In their plea agreements, both Baranowski and Melendez waived claims and consented in advance to forfeiture of, among other things, all personal property seized during the investigation

proposed order addressing them.

and prosecution of this case.  Both Defendants' plea agreements contained the following express

waiver:

> Defendant hereby waives and releases any claims he may have to any vehicles, currency, or other personal property seized by the United States, or seized by any state or local law enforcement agency and turned over to the United States, during the investigation and prosecution of this case, and consents to the forfeiture of all such assets.

Melendez plea agreement (Docket No. 246), at 6; Baranowski plea agreement (Docket No. 310), at

7.  Despite his waiver of claims, Baranowski recently filed a motion seeking return of certain seized

property which Baranowski says belongs to him.  (Docket No. 522).

     Kevin Baranowski was arrested on May 27, 2011, at the Pompano Beach home leased by

John Willis in Peter Melendez's name.   John Willis, Peter Melendez, Baranowski and other

conspirators had been using the home as their Florida base of operations for about three months,

since early March 2011.  Melendez, who lived at that Pompano Beach home, was transporting a

shipment of oxycodone from Florida to Massachusetts on May 27, 2011, and managed to evade

arrest until several months later when he was found in New York City.  Because Melendez's name

was on the Pompano Beach property, and because Baranowski was arrested there, the FBI seizure

records attributed most of the personal property seized at that location to either Baranowski or

Melendez, although John Willis and other conspirators had also been living and conducting criminal

business there.  Some of the property that Baranowski now seeks to have "returned" to him was

attributed to Melendez on the FBI seizure records.

     The proposed Preliminary Order of Forfeiture, as authorized by Fed. R. Crim. P. 32.2(e),

includes certain additional assets seized during the investigation and prosecution of this case, as to

which Melendez and Baranowski (despite his recent motion) have waived claims and consented to

forfeiture, including a firearm, ammunition, and cash seized at the Pompano Beach home.

### Requested Forfeiture Money Judgments

In addition to forfeiture of "tainted" property (*i.e.*, property constituting or traceable to drug proceeds, facilitating property, and property involved in laundering), and forfeiture of "untainted" property as "substitute assets," criminal forfeiture may also be imposed in the form of forfeiture money judgments against the convicted Defendants.  Such judgments are not limited to any tainted property still in Defendants' possession at the time of sentencing; nor does the amount depend on whether Defendants currently have any other untainted property available for forfeiture as a substitute asset pursuant to 21 U.S.C. § 853(p). *United States v. Misla-Aldarondo*, 478 F.3d 52, 73-74 (1st Cir. 2007) (if government proves amount that is forfeitable, court may issue a money judgment in that amount; defendant is liable whether or not "he still has the original corpus of tainted funds—indeed, whether or not he has any funds at all"); *United States v. Hall*, 434 F.3d at 59-60 (government need not prove that defendant actually has forfeited proceeds in his possession at time of conviction; government is entitled to money judgment whether or not defendant currently has forfeited proceeds or any other assets).

It is both appropriate and constitutional to enter large money judgments against significant participants in lucrative criminal activities, such as drug trafficking and money laundering.  *See United States v. Aguasvivas-Castillo*, 668 F.3d 7, 16-17 (1st Cir. 2012) (rejecting Eighth Amendment challenge to $20 million forfeiture money judgment); *United States v. Katz*, 2010 WL 4627872 (1st Cir. Nov. 15, 2010) (summarily rejecting Eighth Amendment excessiveness argument as to $2 million forfeiture money judgment against convicted marijuana trafficker, noting that the defendant had cited "no authority for the proposition that "'excessiveness'" is established by the fact

that paying back the proceeds of a crime may impose a serious financial burden on a defendant"); *cf. United States v. Levesque*, 546 F.3d 78, 83-85 (1st Cir. 2008) (otherwise validly entered forfeiture money judgment could be so onerous as to deprive defendant of future ability to earn a living, thus implicating historical concerns underlying Eighth Amendment's Excessive Fines Clause; remanding $3 million forfeiture judgment imposed on unemployed single mother and high school dropout viewed by the court as a minor player in drug-trafficking conspiracy) .

Drug "proceeds" in the drug forfeiture statute, 21 U.S.C. § 853, means *gross* receipts, including any money or other property that drug traffickers obtain directly or indirectly as a result of their drug trafficking, not reduced by any amounts that they pay for the drugs, or for any other costs or expenses of their illegal drug business. *United States v. Bucci*, 582 F.3d 108, 121-124 (1st Cir. 2009) (jury instruction to this effect was consistent with First Circuit case law).

The oxycodone-trafficking conspiracy charged in Count One generated many millions of dollars in gross proceeds by trafficking hundreds of thousands of oxycodone pills from Florida to New England over a period of about 18 months between about December 2009 and May 27, 2011, and selling the pills to mid-level distributors in New England, except for the tiny portion that was seized by law enforcement -- about 8,000 pills seized from courier Steven Le in Florida on January 18, 2011, and about 4,000 seized from courier Vincent Alberico in Massachusetts on March 22, 2011.

The Probation Office determined that Peter Melendez was personally liable for trafficking at least 131,878, and as many as 231,878, oxycodone pills.  The estimate comprised an estimated 75,000 pills transported by courier Anevay Duffy (25 trips from Florida to New England with an average of 3,000 pills per trip), 24,000 pills transported by courier Michael Shaw (8 trips with an

average of 3,000 pills per trip), the 7,878 oxycodone pills seized from courier Steven Le, and the oxycodone pills transported by Melendez himself between January 2010 and January 2011, on at least 25 trips, often several trips per week, transporting at least 1,000, and as many as 5,000, pills per trip, for a total between 25,000 and 125,000 pills.  At $15 per pill, the price that Willis and company were charging their mid-level purchasers for 30 mg. oxycodone pills for a substantial part of the conspiracy's period of operation, the foreseeable gross proceeds from sale of 231,878 pills, the high end of the conservative range calculated as to Melendez, would have been approximately *$3,478,170*.

The Probation Office holds John Willis liable for at least 159,118 oxycodone pills, 27,240 more than had been attributed to Melendez, to account also for pills trafficked by defendants Mark Thompson and Michael Clemente.  At $15 per pill, the gross proceeds from sale of 159,118 pills -- the low end of the Probation Office's conservative range as to Willis -- would have been approximately *$2,386,770*.  With the additional 27,240 pills added to the high end of Melendez's range, the high end of Willis's range would have generated *$3,886,770* in gross proceeds.

The Probation Office's calculation as to Willis is very conservative.  First, it counts only drug-courier trips made by the indicted defendants in this case.  It does not count the many trips made for the oxycodone conspiracy by numerous other drug and/or money couriers who have been identified during the investigation, including one of the Deering trial witnesses.[8]  Second, as to each defendant-courier, the Probation Office used the low end of its estimate (*e.g.*, attributing only 25,000 pills to Melendez, while acknowledging that his actual count may have been five times higher, at

---

[8] Several of these additional couriers have provided detailed information to the government about their drug-trafficking activities on behalf of the oxycodone conspiracy, and could have been called to testify if the case against John Willis had gone to trial.

125,000 pills).

Most of the oxycodone pills trafficked by the Willis conspiracy went to brothers Stanley and Joshua Gonsalves (separately charged in Case No. 12-cr-10344-PBS), who bought oxycodone pills in bulk amounts from Willis, and then sold the pills to dealers primarily on Cape Cod. As established during preparation for and presentation of evidence at the April 2013 Colby Deering trial, John Willis and company in late 2009 and early 2010 began by selling quantities of 1,000 or more oxycodone pills at a time to the Gonsalves brothers several times per week for prices of around $9 to $10 per pill. By around mid-2010, Willis and company were selling quantities of up to 10,000 oxycodone pills at a time to the Gonsalves brothers on an almost daily basis, at a price of about $15 per pill. At that point, the Willis conspiracy's gross proceeds from *a single day's* oxycodone shipment of 10,000 pills sold to the Gonsalves brothers at $15 per pill were as high as $150,000.[9] During this same period, Willis and company were also distributing oxycodone pills in quantities of several hundred pills at a time to Jason Boyd (separately charged and convicted in the District of Vermont), who sold them to dealers in Vermont.

For all of these reasons, it is more likely than not that the gross proceeds of the Count One oxycodone-trafficking conspiracy over its 18-month life-span were substantially more than $3.9 million.

The government could seek a joint and several criminal forfeiture money judgment in the total amount of the 18-month conspiracy's gross oxycodone-trafficking proceeds from each of the

---

[9] A trial witness at the Deering trial, who made several trips to Florida in furtherance of the conspiracy, testified to having personally flown one of these $150,000 cash payments to Fort Lauderdale, where the courier delivered the payment to Peter Melendez. The same witness testified that in about the spring of 2011, the witness had seen Stanley Gonsalves in possession of over $900,000 in *net* cash oxycodone-trafficking proceeds.

defendants convicted of the Count One oxycodone-trafficking conspiracy, to the extent that the total gross proceeds amount was reasonably foreseeable to each defendant. *See United States v. Candelaria-Silva*, 166 F.3d 19, 42-44 (1st Cir. 1999) (even minor participant in money laundering conspiracy was liable for full foreseeable amount); *United States v. Hurley*, 63 F.3d 1, 22 (1st Cir. 1995) (even minor participants are liable for full amount of money laundered by the organization, insofar as it was foreseeable to them).  As the court of appeals explained in *Candelaria-Silva* and *Hurley*, "'the government can collect [the total gross proceeds amount subject to forfeiture] only once but, subject to that cap, it can collect from any [defendant] so much of that amount as was foreseeable to that [defendant].'"  *Candelaria-Silva*, 166 F.3d at 44 (quoting *Hurley*, 63 F.3d at 23). Like a civil plaintiff collecting a joint and several money judgment, the government, as plaintiff in this criminal case, is thus entitled to collect all, or part, of the total judgment amount due from *any* particular defendant, so long as it does not collect from *all* of the defendants more than the total forfeitable amount.

Based on the evidence presented at the Colby Deering trial and summarized in the government's offense conduct statements to the Probation Office about the scope, volume, and 18-month duration of the oxycodone-trafficking conspiracy, the conspiracy's gross proceeds, more likely than not, substantially exceeded the $3.9 million high end of the Probation Office's conservatively calculated range.   As explained below, however, the government is seeking much less than that foreseeable gross proceeds amount from any one Defendant, and is seeking a total judgment amount against all Defendants which falls well short of the (likely understated) $3.9 million figure.   The money judgment amounts sought against particular Defendants, and the government's reasons for seeking those amounts, are summarized below.

## PROPOSED FORFEITURE ORDERS

As explained in more detail below, the government requests that the Court enter a single proposed Preliminary Order of Forfeiture as to all Defendants, addressing particular forfeitable seized and restrained property, and that the Court enter individual criminal forfeiture money judgments against the as-yet unsentenced Defendants as set forth below.

### JOHN WILLIS

John Willis was the "hub" and leader of the conspiracies charged in Counts One and Two. Willis organized the conspiracies, recruited most of the members, controlled and directed all of the members' criminal activities in furtherance of the conspiracies, and controlled the money involved in both conspiracies.  All of the actions of the conspirators were reasonably foreseeable to Willis, and he is liable for them.

In addition to using huge amounts of drug proceeds to buy more oxycodone for the conspiracy, Willis acquired with drug proceeds, held in the names of others, and enjoyed using a wide variety of expensive vehicles, boats, and other assets during the conspiracy, and also used drug proceeds to house, feed, and entertain himself, his girlfriends (including, but not limited to, defendant Anh Nguyen), and numerous other co-conspirators over the entire life of the conspiracy. More than any other conspirator, Willis enjoyed the "high life" afforded by the conspiracies' immense amounts of criminal proceeds.

In addition to forfeiture of the particular seized property listed in the proposed Preliminary Order of Forfeiture, much of which is encumbered by liens and therefore worth substantially less than its face value, the government moves that the Court enter a $2,000,000 forfeiture money judgment against Willis.  This amount is conservative.  It uses as a guide the very conservative

$1.978 million low end of the gross proceeds range calculated for Peter Melendez (*i.e.*, 131,878 pills at $15 per pill) rather than the higher (but still very conservative) $2.387 million low end of the gross proceeds range calculated by the Probation Office for Willis himself (*i.e.*, 159,118 pills at $15 per pill), although both of these estimates omit the gross proceeds from sale of the large additional quantities of oxycodone carried by the conspiracy's several known non-defendant couriers.

For all of these reasons, the requested $2,000,000 money judgment is reasonable and just as to John Willis.

## BRANT WELTY

John Willis and Brant Welty considered each other brothers.  Welty was Willis's Boston drug-trafficking manager and Willis's primary money launderer.  Welty personally conducted numerous exchanges of money for oxycodone, and supervised other conspirators' exchanges of money and drugs.  Significantly, Willis trusted Brant Welty with the conspiracies' money and entrusted Brant Welty with direct responsibility for Willis's largest-scale money laundering schemes involving Cru and the attempted acquisition of a Fort Lauderdale nightclub through 9Five4 Nightclub Group, Inc.  From his high vantage point in the Willis organization, Brant Welty therefore knew, or reasonably could have foreseen, all, or substantially all, of the oxycodone trafficked by the drug conspiracy, the gross proceeds generated by that conspiracy, and the property involved in the money laundering conspiracy.

Nevertheless, in an exercise of discretion, as authorized by *Hurley* and *Candelaria-Silva*, the government has agreed (see Stipulation, Docket No. 572) to request a forfeiture money judgment against Brant Welty in the amount of only $85,500, the same money judgment amount that the Court entered against Willis's Florida manager Peter Melendez, in addition to forfeiting particular property

32

seized from Brant Welty, his apartment, and the premises of Cru Wine & Spirits, Inc.

## AIBUN ENG

In his plea agreement, in addition to waiving rights to contest the forfeiture of seized property generally, Aibun Eng specifically agreed to forfeit a white 2000 Honda Odyssey, Massachusetts Registration No. N19060, VIN 2HKRL1866YH590541, which Eng admittedly used in the course of the marijuana transaction that he was caught conducting as part of the originally charged Count One drug trafficking conspiracy.  The government now seeks to forfeit that vehicle.

Eng's single admitted marijuana transaction did not generate proceeds.  Therefore, the government does not seek a forfeiture money judgment against Eng.  As agreed, however, the government will recommend that the Court impose a criminal fine on Eng within the Sentencing Guideline range as calculated by the Court, unless the Court finds that Eng is not able and, even with the use of a reasonable installment schedule, is not likely to become able to pay a fine.

## BRIAN BOWES

In his plea agreement, Brian Bowes waived rights to contest the forfeiture of seized property generally, and specifically agreed to forfeit:  (a) A money judgment "up to the total amount of gross drug proceeds;" and (b) the approximately $37,590 in drug proceeds that Bowes was transporting from Boston to Florida for the conspiracy when the money was seized by the Massachusetts State Police on or about December 1, 2010, at Logan Airport.  Bowes' forfeiture waiver also encompasses the firearm, magazine, and ammunition seized from Bowes incident to his arrest in Florida on May 27, 2011, that is, FBI Seizure No. 1B13, one Glock Semi-Auto 9 mm. Handgun Model 26 S/N: KPE731; and FBI Seizure No. 1B14, one firearm magazine and approximately 17 rounds of .40

caliber ammunition.   Bowes possessed and carried the firearm, magazine, and ammunition in furtherance of the oxycodone-trafficking conspiracy.  They are therefore forfeitable pursuant to 21 U.S.C. § 853(a)(2).

Bowes, like Peter Melendez, was an original member of the oxycodone-trafficking conspiracy with John Willis, and participated in the conspiracy from beginning to end.  Bowes also recruited and supervised conspirator/pill-gatherer Michael Clemente.   The Probation Office calculated that Bowes is directly liable for at least the $37,590 in drug proceeds seized from him at Logan Airport and the $18,520 in money orders that Bowes received in furtherance of the conspiracy between January 14, 2010 and June 26, 2010.  The Probation Office calculated that Clemente is liable for obtaining at least 6,917 oxycodone pills, which would have generated about $103,755 in gross proceeds at $15 per pill.  Although a much larger gross proceeds amount was reasonably foreseeable to Bowes as a "charter member" of the oxycodone-trafficking conspiracy, the government requests a forfeiture money judgment against Bowes in the amount of $70,397, which comprises the unseized $18,520 in proceeds directly attributable to Bowes, plus half of the $103,755 gross proceeds liability of Bowes' supervisee, Clemente.

## MICHAEL CLEMENTE

In his plea agreement, in addition to waiving rights to contest the forfeiture of seized property generally, Michael Clemente acknowledged that the Court would order forfeiture against him as part of his sentence, and that the forfeiture could include "a money judgment equal to the value of the property derived from, or otherwise involved in, the offense."  Although he was not an original member of the conspiracy, Michael Clemente worked for the conspiracy in Florida for a substantial period of time, primarily as an oxycodone-pill gatherer.

34

Clemente admittedly used many thousands of dollars in drug proceeds to purchase thousands of pills for the conspiracy in multi-hundred-pill quantities from at least two different sources in the Miami area. Clemente then delivered those pills to co-conspirators Willis, Melendez, Bowes, and Anevay Duffy to be packaged with pills collected by other pill-gathers and transported to Boston for sale. While he was doing this, Clemente knew that other conspirators were also gathering and transporting pills to Boston for the conspiracy in multi-thousand pill quantities, and transporting large amounts of cash drug proceeds back to Florida, some of which was turned over to him to buy more oxycodone. As indicated above, the Probation Office calculated that Clemente is liable for obtaining at least 6,917 oxycodone pills, which would have generated about $103,755 in gross proceeds at $15 per pill. Although the government could have sought to hold Clemente liable for a much larger gross proceeds amount, the government requests a forfeiture money judgment against Clemente of $51,877, which represents half the gross proceeds amount attributable to the "at least" 6,917 pills calculated by the Probation Office.

### BRIDGET WELTY

In her plea agreement, Bridget Welty consented to the entry of a forfeiture money judgment in the amount of $21,500.00, representing the amount of funds involved in the structuring offense, in violation of 31 U.S.C. § 5324(a), charged in Count One of the Superseding Information. She also waived the right to contest forfeiture of a long list of particular assets, and all other property seized during the investigation, agreeing that the property is forfeitable to the United States under either the drug trafficking or money laundering forfeiture statutes, with one exception.

In her plea agreement, Bridget Welty asserted that a certain men's stainless steel Tag Heuer watch with 11 single-cut diamond dot markers, model WJ1114-0, s/n YP7640, which was seized

from her and Brant Welty's apartment and identified as included in FBI Asset ID No. 11-FBI-004758, had been given to her as a gift and was not the proceeds of, or involved in, criminal activity.

For purposes of settlement, the government hereby accepts Ms. Welty's assertion that this watch was not proceeds of, or involved in, criminal activity. The government therefore moves to forfeit the watch instead as a substitute asset of Ms. Welty pursuant to 21 U.S.C. § 853(p). The net proceeds from sale of the watch will be credited toward Ms. Welty's assented-to forfeiture money judgment.

## COLBY DEERING

Colby Deering was convicted after trial on both the Count One oxycodone-trafficking conspiracy and the Count Two money laundering conspiracy. The trial evidence established that Deering was involved in the two conspiracies for at least about 13 months, from at least April 8, 2010, when Deering agreed to serve as Willis's straw purchaser on the vessel "Double Down," through May 27, 2011, when Deering went to Willis's Park Street, Dorchester, apartment to pick up more money from Willis, and ran into FBI agents who were in the process of seizing the $85,000 Bentley that Willis had purchased in Deering's name.

Although the trial evidence established that a much greater amount of gross drug proceeds was reasonably foreseeable to Deering, and that Deering was personally involved in numerous other drug and money transactions in furtherance of the conspiracies, the government requests a money judgment against Deering in the same amount sought against several other conspirators, $85,500.00. This represents about half of $172,151 -- the amount of drug proceeds involved in the following well-documented drug-funded money laundering transactions in which Deering personally and directly participated on behalf of John Willis and the conspiracy:

36

| | | |
|---|---|---|
| a. | Purchase of Double Down: | $25,260 |
| b. | Bentley down-payment: | $46,900 |
| c. | Bentley car loan payments: | $ 8,401 |
| d. | Bentley Arbella insurance: | $ 1,793 |
| e. | Wilton Manors First/Last/Security: | $12,000 |
| f. | Wilton Manors rent payments: | $12,000 |
| g. | Escalade loan payments: | $ 2,670 |
| h. | Payment to Hertz for Malibu rental: | $ 2,727 |
| i. | Buy money taken to Tampa 10/8/10: | $20,000 |
| j. | Buy money taken to Tampa 10/16/10: | $25,000 |
| k. | Steven Le cash bail: | $15,000 |
| | TOTAL: | $172,151 |

## ANH NGUYEN

The witness tampering offense to which Anh Nguyen pled guilty did not itself generate proceeds. However, Nguyen, who lived with John Willis and was supported by Willis with drug proceeds throughout the charged conspiracies, has admitted that she corruptly attempted to persuade a material witness not to talk to the FBI at all, or to provide false information to the FBI, concerning John Willis's straw purchase with drug proceeds, and subsequent straw transfer, of the red 2005 Hummer H2 listed in the forfeiture allegations. Under USSG §2J1.2(c), applying USSG §2X3.1, Ms. Nguyen is viewed by the Sentencing Guidelines as an accessory after the fact as to Willis's money laundering conspiracy, which the FBI was investigating at the time of her witness tampering offense of conviction.

In Anh Nguyen's plea agreement, the government agreed to recommend that the Court impose a fine within the Sentencing Guideline range as calculated by the parties in Paragraph 3 of the agreement (*i.e.*, Offense Level 12, after credit for acceptance of responsibility), unless the Court finds that Defendant is not able and, even with the use of a reasonable installment schedule, is not likely to become able to pay a fine. Anh Nguyen Plea Agreement (Docket No. 533), at 4. The Guideline fine range for Offense Level 12 is from $3,000 to $30,000. In order to hold Anh Nguyen

37

accountable for her own criminal conduct and for a small portion of the drug proceeds generated and laundered by Willis, and in lieu of a forfeiture money judgment, the government will request that the Court impose on Nguyen a criminal fine in the amount of $24,000, the purchase price of the Hummer H2 that was the subject of her witness tampering, unless the Court determines that Nguyen is not able, and unlikely to become able, to pay such a fine.

In her plea agreement, in consideration of the government's having agreed to dismiss Count One and Count Two against her at sentencing, Anh Nguyen also waived the right to contest forfeiture of a long list of specified assets and all other property seized during the investigation, with the exception of four pieces of jewelry seized on May 27, 2011, from the Park Street, Dorchester, apartment occupied by Defendants Willis and Nguyen:

> A platinum band ring with approximately 3k round diamond stone;
> A white gold ring with approximately 1k in diamonds embedded in band;
> A diamond encrusted necklace with two solitaire diamond pendants; and
> A pair of diamond earrings,
> all described by Anh Nguyen in a petition signed by her under the penalty of perjury on or about August 28, 2011, and submitted to the FBI, as items from her aunt's estate which she received from, and was holding for, her uncle.

Anh Nguyen Plea Agreement  (Docket No. 533), at 6-10 & Schedule 1.

After consultation with counsel for Anh Nguyen and with the FBI Asset Forfeiture Unit, the government has agreed to release these four items to Ms. Nguyen once these items have been conclusively identified.  They will be addressed in a separate motion and proposed Order Returning Property at or before Ms. Nguyen's sentencing.

## PETER MELENDEZ and KEVIN BARANOWSKI

The government seeks to forfeit the following additional property, seized during the May 27, 2011, search of the Pompano Beach home held in Peter Melendez's name and used as a base of

operations for the drug and money laundering conspiracies from early March 2011 until the date of the search, and/or seized incident to the arrest of Kevin Baranowski at that location:  Seized Items No. 1B68 - Two (2) Sig Sauer .40 Cal. magazines with 24 Rounds of ammunition; No. 1B69 - Sig Sauer P226 .40 Cal. pistol, S/N: UU613193; and Nos. 1B72, 1B73, 1B75, and 1B78 - a total of approximately $2,026.00 in U.S. Currency.

These items are forfeitable to the United States on several grounds.  The pistol, magazines, and ammunition seized at the conspiracy's Pompano Beach home were, more likely than not, used to facilitate the conspiracies by protecting drugs and drug proceeds.  The currency seized at that home, where only conspirators lived,  more likely than not constituted or was derived from proceeds of the drug trafficking conspiracy.  Even if any of these items belonged to Melendez and/or Baranowski, and *not* to Willis and/or the several other conspirators who also resided at and used the Pompano Beach home for their criminal activities, the items are subject to the broad Melendez and Baranowski forfeiture waivers and are also forfeitable as substitute property in partial satisfaction of their unpaid money judgments.

The government has agreed to return to Baranowski, through his counsel, a silver Breitling watch seized incident to Baranowski's arrest, and will file a separate motion and proposed order addressing it.

WHEREFORE, the United States requests that this Court:

(a) enter the proposed Preliminary Order of Forfeiture submitted with this motion;

(b) enter against John Willis the proposed $2,000,000.00 Order of Forfeiture - Money Judgment submitted with this motion;

(c) enter against Brant Welty the proposed $85,500.00 Order of Forfeiture - Money Judgment

submitted with this motion;

(d) enter against Brian Bowes the proposed $70,397.00 Order of Forfeiture - Money Judgment submitted with this motion;

(e) enter against Michael Clemente the proposed 51,877.00 Order of Forfeiture - Money Judgment submitted with this motion;

(f) enter against Bridget Welty the proposed $21,500.00 Order of Forfeiture - Money Judgment submitted with this motion; and

(g) enter against Colby Deering the proposed $85,500.00 Order of Forfeiture - Money Judgment submitted with this motion;

(h) include forfeiture pursuant to the applicable Orders of Forfeiture in the Court's oral announcement of Defendants' sentences; and

(i) incorporate the applicable Orders of Forfeiture by reference in the criminal judgments entered against Defendants, pursuant to Fed. R. Crim. P. 32.2(b)(4).

Respectfully submitted,
CARMEN M. ORTIZ
United States Attorney

By:     s/Richard L. Hoffman
Richard L. Hoffman
Timothy E. Moran
Assistant U.S. Attorneys
United States Courthouse
1 Courthouse Way, Suite 9200
Boston, MA  02210

Date:  May 24, 2013                              (617) 748-3279

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that today, May 24, 2013, I am filing the foregoing motion and the proposed Orders of Forfeiture via the ECF system, which will cause copies to be served upon the defendants by sending copies by email to their attorneys of record.

<u>s/Richard L. Hoffman</u>
Richard L. Hoffman
Assistant U.S. Attorney