1
2          IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF MASSACHUSETTS
3

   UNITED STATES OF AMERICA,          )
4                                      )
                    Plaintiff          )
5                                      )
            -VS-                       )  Criminal No. 11-10212-JLT
6                                      )  Pages 1 - 22
   JOHN WILLIS,                        )
7                                      )
                    Defendant          )
8

9                          **SENTENCING**

10

11          BEFORE THE HONORABLE JOSEPH L. TAURO
              UNITED STATES DISTRICT JUDGE
12

13
   A P P E A R A N C E S:
14
        RICHARD L. HOFFMAN, ESQ. and TIMOTHY E. MORAN, ESQ.,
15  Assistant United States Attorneys, Office of the United States
    Attorney, 1 Courthouse Way, Room 9200, Boston, Massachusetts,
16  02210, for the Plaintiff.

17       JEFFREY A. DENNER, ESQ., Denner Pellegrino LLP,
    Four Longfellow Place, Suite 3501, 35th Floor, Boston,
18  Massachusetts, 02114, for the Defendant.

19  ALSO PRESENT:  Christopher Foster, U.S. Probation Office.

20                              United States District Court
                                1 Courthouse Way, Courtroom 22
21                              Boston, Massachusetts  02210
                                August 15, 2013,
22

23                  LEE A. MARZILLI
                 OFFICIAL COURT REPORTER
24            United States District Court
              1 Courthouse Way, Room 7200
25                Boston, MA  02210
                   (617)345-6787

P R O C E E D I N G S

1

2          THE CLERK:  This is criminal matter No. 11-10212, the

3    United States of America v. John Willis.  Will counsel please

4    identify themselves for the record.

5          MR. MORAN:  Good afternoon, your Honor.  Timothy Moran

6    and Richard Hoffman for the United States.

7          MR. HOFFMAN:  Good afternoon, your Honor.

8          THE COURT:  All right.

9          MR. DENNER:  Good afternoon.  Jeffrey Denner for John

10    Willis, and John Willis is here.

11          THE COURT:  Okay.  And he is here in court, and we're

12    here for disposition; is that right?

13          MR. MORAN:  Yes, your Honor.

14          THE COURT:  The government has a recommendation?

15          MR. MORAN:  Yes, your Honor.

16          THE COURT:  And what's your recommendation?

17          MR. MORAN:  300 months, which is 25 years, your Honor.

18    And that's a very long sentence, I understand, so let me

19    explain, if I may, the government's reasoning for requesting

20    that sentence.

21          THE COURT:  Go ahead.

22          MR. MORAN:  Let me start with the advisory Sentencing

23    Guidelines range.  I've had an opportunity to speak this week

24    with defense counsel.  I don't believe we have any dispute

25    regarding the analysis of the Guidelines.  The government is

1 | adopting Probation's analysis.

2 |      To review it briefly, it's based on 159,118 pills,

3 | which, for the reasons I lay out in my sentencing memo, we

4 | believe is a conservative number but sufficient for these

5 | purposes because it's equivalent to over 31,000 kilograms of

6 | marijuana, which is Base Offense Level 38.  That's the absolute

7 | top of the drug chart.  To that number is added two levels

8 | because firearms were possessed, another two levels --

9 |      THE COURT:  Wait a minute.  Get to the heart of it.

10 | You've got somebody who's never been to jail before except

11 | once, I guess, for three years, and why don't you tell me why

12 | this is an appropriate sentence without going through the

13 | mathematics.

14 |      MR. MORAN:  Yes, your Honor, and I think he has been

15 | in jail --

16 |      THE COURT:  Once for three years, I think.

17 |      MR. MORAN:  For longer than that, your Honor.  He's

18 | Criminal History Category VI because he's a career offender,

19 | and he has, even without the career offender designation, he

20 | has ten criminal history points.

21 |      THE COURT:  I'm not trivializing it.  I'm just saying,

22 | I think you have so much to talk about without going into the

23 | math that created the guideline.

24 |      MR. MORAN:  Yes, your Honor.  Let me start with his

25 | criminal background.  He has arrests going back to age 18,

1   arrests for violence going back to age 19.  He now stands

2   before you, your Honor, at 42 years old.  What we've got is a

3   pattern of criminal activity followed by incarceration for ever

4   longer periods.  He has acts of extortion, threats, I believe.

5   He's got a heroin conviction out of the Superior Court.  He was

6   sentenced to a six- to eight-year term, your Honor, and what we

7   saw in that was five or six separate violations of probation or

8   parole.  So while he may have had a chance to serve, as your

9   Honor is suggesting, a shorter period of two to three years, he

10  actually ended up serving most of that sentence because he was

11  on probation, had to be sent to jail, was paroled, had to be

12  sent back; and that happened, there are at least five separate

13  occasions.

14          What we see is a criminal who's not getting any wiser

15  and not becoming any less dedicated to criminal activity.  In

16  fact, what you see, your Honor, is a pattern of a criminal

17  becoming emboldened in his disrespect for the law.  And I think

18  there was an interesting exchange on the wire, which is

19  summarized in the sentencing memo.  There were wire intercepts.

20  At one point during the pendency of the investigation,

21  Mr. Willis was arrested in Dorchester for driving his Bentley

22  without a license.  That triggered a probation violation out of

23  Plymouth District Court for a similar charge.  He shows up the

24  next day in Plymouth District Court.  This is about December 7,

25  2010.  He walked into the courtroom, was there for the call of

1    the court, and the judge there indicated that she was going to

2    revoke his probation and sentence him to 60 days in jail.  And

3    he flat out walked out, in complete disregard of the

4    obligations to the criminal justice system.  And then you've

5    got an insight into his view of the matter on the intercepts

6    later on.  And you'll please pardon my language, your Honor,

7    but to use his term, he called the judge "a total bitch" and

8    thought the head of Probation, who no doubt had recommended a

9    modest jail term of 60 days, ridiculous.

10        So this is a defendant who has been in and out of the

11   criminal justice system for over half his life and has not

12   learned, has faced increasingly long sentences; and that's why

13   a particularly long sentence is required here because you also

14   see that the heightened nature of his criminal activity becomes

15   more and more serious, culminating in this conspiracy here.

16        So let me touch for a moment on the conspiracy itself.

17   I outlined the Guideline range, and the Guidelines are through

18   the roof, but what really matters is not so much the simple

19   arithmetic but what was going on here, and what was going on

20   here was a conspiracy to traffic hundreds of thousands of pills

21   of Oxycodone.  And you don't need to hear what I have to say

22   about it.  The statistics and what neutral third parties have

23   found is really telling here.  According to the CDC, in 17

24   separate states, painkillers, including Oxycodone, are the

25   number one cause of accidental death, the top cause of

1    accidental death.

2         Now, let's turn to Massachusetts.  According to a

3    recent study in Massachusetts -- this is the Commonwealth

4    Recommendations of the OxyContin and Heroin Commission, and

5    this was released in 2009 -- there was an average of two

6    citizens of Massachusetts dying per day from Oxycodone, two per

7    day of people in our own Commonwealth.  And according to that

8    same report, over a recent ten-year period, addiction to

9    Oxycodone had multiplied by 950 percent.  So putting all the

10   numbers aside, there's a raging epidemic in this state of

11   Oxycodone abuse.  It's not hypothetical.  It's true to life.

12   It's causing people to die.  And this defendant, more than any

13   other person who's responsible for it, he's responsible for

14   hundreds of thousands of pills that were coming into

15   Massachusetts that were fueling this epidemic and causing

16   people to die.  Those are the numbers that really matter in

17   this case, your Honor.

18        That's the best example of the seriousness of his

19   criminal conduct, but we also see that he is a dangerous

20   criminal because of his connections to organized crime,

21   particularly Asian organized crime.  The wire investigation

22   reveals many incidents of him being in connection with the

23   operation of a gambling den, involving extortion, and basically

24   serving as an enforcer for a brothel operator.  Given this

25   information under 3553(a), it doesn't factor in the Guidelines,

1    but it tells you about this defendant.  It's what he's capable

2    of.  It's those connections, the fact that he has these

3    connections, that he speaks three or four languages, that he's

4    creative, daring, inventive, not afraid of any criminal

5    activity, that makes him such a threat, and the fact that he's

6    willing to engage in criminal activity after repeated

7    sentencings by various courts of this Commonwealth that makes

8    him such a threat and requires such a long sentence.  It's to

9    protect society, not simply to rehabilitate him or punish him

10   but to protect society, to keep him out of the public and away

11   from committing crimes.

12           I want to make one final point, your Honor -- I know

13   you've read my sentencing memo which goes into this in more

14   detail -- and that's the comparison to other defendants in this

15   case.  Your Honor is well familiar with this case by this

16   point.  You've heard the trial of a co-defendant.  You've heard

17   me stand before you many times on various matters and

18   requesting sentences.  I think I've always been consistent in

19   saying that this man, John Willis, is at the apex of these

20   conspiracies.  He was always calling the shots.  It was his

21   idea.  He led this.  He directed it.  He found the conspiracy.

22   He ran it.  He belongs at the top.

23           Now, what's kind of interesting as I turn to

24   comparison of other defendants is that although it's true that

25   all the participants in the conspiracy benefited from his

activities and enjoyed the parties, the lifestyle, the fast
cars, the nightclubs, the strip joints, the women, the drugs,
the alcohol, the proverbial wine, women, and song, they all
enjoyed that, no one enjoyed it to a greater extent than
Mr. Willis.  Really, he was the single largest beneficiary of
the immense amount of money generated by this conspiracy.

Secondly, although every defendant in this case is
responsible for his or her own actions, many of those
defendants were the friends, the family members, the neighbors,
just the people with whom Mr. Willis came into contact.  I saw
on the way in here Miss Anh Nguyen is in the courtroom.  That's
the defendant's girlfriend.  She was sentenced by your Honor.
She would not have been involved if not for Mr. Willis.  He
naturally attracted and recruited people who had no other
criminal history.

Your Honor had started by asking what about his prior
criminal -- having served time before.  Many of the defendants
who come before your Honor have never served any time before.
Those are the people that he was targeting and seducing into a
world of criminal activity.  In my view, that makes it more
serious because he's targeting people who might otherwise
have -- now, they're responsible for their own behavior -- I
don't mean to suggest otherwise -- but these are people who
were attracted to him because they had no criminal history, who
could act as straw purchasers, put their names on cars, boats,

1  apartments, who could get through TSA and carry drugs on

2  planes, who could rent cars to carry drugs in.  These people

3  were attracted to him for that reason, they were vulnerable to

4  him for that reason, and now they face long criminal sentences

5  of their own.

6        And it's also noteworthy that among the people in the

7  conspiracy, Mr. Willis never carried drugs.  He never put his

8  name on the documents.  He always turned to others to bear the

9  risk.  In my view, that makes him more deplorable because he

10 put the risk on the others and benefited more than any others.

11       So bearing that in mind, the last point I want to

12 make, your Honor, is in terms of comparison to other

13 defendants.  I think the key datum is Peter Melendez.  He was a

14 lieutenant to Mr. Willis.  He was in Florida.  He ran the

15 Florida operation when Mr. Willis wasn't there.  He was

16 sentenced by your Honor to 160 months, which is 13 years and

17 change, if my arithmetic is correct.  His range was lower than

18 Mr. Willis'.  He actually entered into a (c) plea agreement

19 which had a range of 151 to 180 months, and your Honor

20 sentenced him in the middle of that range.

21       With this benchmark of 160 months for Melendez,

22 Mr. Willis has got to be significantly higher than that to

23 reflect the fact that he was the founder and director of the

24 conspiracy, had a much greater role, is a much more violent

25 person, has a history of actual physical violence, has the

1   connections to organized crime, possessed the guns, was

2   involved in the money laundering.  All those factors that take

3   him a notch higher than a Peter Melendez, who already got

4   160 months from your Honor, cry out for a sentence much longer

5   than that.  And it would also be consistent with the sentence

6   that your Honor has already imposed to the middle tier of

7   defendants, which range from 57 to 80 months, and for what I

8   would consider the lowest tier of defendants, the people who

9   weren't convicted of drug conspiracy or money laundering

10  conspiracy who essentially got noncustodial sentences from your

11  Honor.

12          I understand that I'm asking your Honor to impose a

13  very, very long sentence.  It's a serious matter.  Although

14  it's half of what the Guidelines call for, any sentence of this

15  length is a very serious matter.  I appreciate that.  I believe

16  a sentence of this length is warranted by the facts of this

17  case and the circumstances of this defendant, who is a very

18  dangerous, dedicated, hardened, serious career criminal.

19          THE COURT:  Thank you.

20          MR. MORAN:  Thank you, your Honor.

21          THE COURT:  Do you want to be heard?

22          MR. DENNER:  Thank you, your Honor.  The longer I do

23  this as a criminal defense lawyer, the less I know about what a

24  just sentence is and what a fair sentence is.  I will tell you

25  that my brother talks about Ms. Nguyen who's in court today, if

1     she hadn't known Mr. Willis and he hadn't gotten her involved,

2     that she wouldn't have been a criminal defendant.  I will tell

3     you, I can point to an awful lot of things in his life, had

4     they not happened to him and people he had met, that he

5     wouldn't have been a criminal defendant either, and I find that

6     really compelling.

7            When I look at him, I see a man who's basically being

8     raised -- his father is a vicious drunk who leaves him and the

9     wife, his mother, at a pretty early age.  After that, he's kind

10    of raised by his mom and his older brother, who's considerably

11    older than he is.  And the older brother is doing well, manages

12    to get a house, and he and his mom and his brother and I guess

13    another sibling were living in the house.  And the brother dies

14    at age 34 when he is still a very, very young teenager, just

15    basically entering his teenage years.  The brother dies.  The

16    mother, the other influence in his life, at that point is

17    seriously diabetic, is put in a wheelchair, has serious

18    cardiovascular problems, is being operated on, and he is taking

19    care of her.  She is the last vestige of any kind of guidance,

20    love, family, that he has and that he's close to, and in the

21    surgery that she has, she dies.  So he is probably about 14

22    years old, perhaps closer to 15, perhaps closer to 13 -- it's a

23    little unclear to him, and, I'm sorry, it's a little bit

24    unclear to me -- but he's a young teenager, and suddenly he's

25    living in the house that he can't pay for.  He has no job.  He

1    drops out of school.  There's no heat in the house, as the PSR

2    indicates and as I've learned from talking to him and to

3    others, and he's living in that house by himself alone.

4            He is in shock.  He's lost his brother who was like a

5    father to him.  He's lost his real father who has nothing to do

6    with him.  He's lost his mother who he was caring for and was

7    caring for him.  So he's alone, and he's petrified, and he's

8    got nobody to turn to.

9            Now, does this excuse the next 25 years?  Of course

10   not, but it certainly puts it in a little bit of a different

11   context.  If we're going to start talking about cause and

12   effect, that he caused different people to get involved in

13   things, then we need to look at the cause and effect in his

14   life.  So he's there, and he begins to find -- he goes to his

15   half sister, Linda, who takes him in for a while.  He has to

16   leave the house.  They don't let him stay in the house anymore,

17   even though he's simply living there with no heat, virtually no

18   food, different people bringing food from time to time.  He

19   stays in different people's houses.  His sister Linda takes him

20   in, who is an unrepentant and very serious drug addict, and it

21   goes from bad to worse for him.

22           And he leaves that house, and he goes from house to

23   house, friend to friend, just trying to stay there, just trying

24   to get food, trying to get lodging.  And he ends up with

25   friends in the Asian community who take him in, and he

1    recreates a family for himself in the Asian community as a

2    16-year-old.  And these are the wrong people, just like he

3    might have been the wrong person for Anh Nguyen or the other

4    co-defendants in this case that he knew when he got into this

5    because he was the apex of this conspiracy for approximately a

6    year and a half, money laundering and drug conspiracy, and it

7    was his conspiracy.  And he got into that through his

8    connections with the Asian community, people who took him in,

9    the people who became his family, became his friends.  And

10   basically a kid who had no money and no future and no ability

11   to see his way past survival, suddenly culturally he had a

12   whole new group.  And unfortunately this was an Asian organized

13   crime, at least a big part of the group, and he got involved in

14   it.  And he did, he did.  He didn't go to the Harvard Business

15   School or Cornell to decide that he was going to break the law

16   and he was going to embezzle or do insider trading or a variety

17   of other things that people do and make huge amounts of money

18   and do far fewer years than the 25 years that they're

19   suggesting.

20          But he did get involved with these people.  They

21   became his family.  Their code of honor became his code of

22   honor because, really, that's all he had.  It meant an awful

23   lot to him.  He learned how to speak the language.  He didn't

24   grow up speaking Chinese and Vietnamese and learned it so he

25   could become an organized crime individual in the Asian gangs.

1    This is where they took him.  And could he have broken away

2    from that and made a better life and a different life for

3    himself?  Yeah, he could have.  And then he wouldn't be here

4    today; he wouldn't have pleaded guilty to these very serious

5    offenses.  But he is here today, and he did plead guilty.

6         But when you take a look at this man and you take a

7    look at the bad he's done, you kind of take a look at the

8    antecedents of that and see how he got there.  I find that to

9    be a compelling mitigating circumstance.  I simply do.  And I

10   think, when you take a look at a lot of other sentences, not

11   only in this case but the sentences we see meted out all the

12   time, we understand that some federal defendants and witnesses

13   have an opportunity to do very well in life, and others don't.

14   He was one of those people who didn't have an opportunity to do

15   a heck of a lot, and he's facing very serious time.

16        I don't know how to pick numbers out of the air; you

17   know, 26 years is good, 22 years, 18, 15?  I don't know.  I

18   don't know what's fair.  What I know is that he started out as

19   a kid who was very pure, doing very, very well in life with a

20   brother who was like a father and a mother who was bringing him

21   up beautifully, and they died bad deaths.  And he was left

22   alone and he was scared, and he didn't have guidance.  He

23   didn't have backup.  Everything was survival to him.  He met a

24   group that taught him how to survive, and he went on to build

25   on that and make huge mistakes in his life.

1          I have to believe, after doing this myself for 40

2    years, that 25 years is just too long.  I don't know what the

3    right time is.  I don't know.  I don't know if 15 years is

4    fair.  I don't know if 18 years is fair.  I don't know.  And

5    you have a better idea than I based on the continuity of

6    sentencing you do on a regular basis, but what I will tell you

7    is that you take somebody who started the way he did, who

8    didn't have a lot of chance at first, could have done better,

9    he didn't do better.  He's going to have to do better going

10   forward.  He has two children that I know that he wants to

11   reconnect with.  He was the father figure for Anh Nguyen's

12   10-year-old, and I think they did a very good job, and I know

13   he'd like to get back to her if it's at all humanly possible

14   someday.

15          He understands that he's made huge mistakes.  He

16   understands that it really doesn't matter on some level that he

17   had made the mistakes or why he made the mistakes as a defense

18   to the charges in this case; but in terms of trying to weigh as

19   a human being, as a man, what he did, why he did it, and what

20   the mitigating factors should count for in his lifetime, I

21   would respectfully suggest 25 years is too long.  I don't know

22   if 15 years is too short a time.  I'm suggesting 15 years and

23   six years of supervised release, and that's my request.

24          THE COURT:  Do you want to be heard anymore,

25   Mr. Moran?

1          MR. MORAN:  No, your Honor.

2          THE COURT:  Mr. Willis, you're about to be sentenced.

3     As one who faces sentencing, you have the right to address the

4     Court.  That means you can tell me anything that's on your own

5     mind if you care to do so.  If you prefer to remain silent, you

6     can remain silent without fear of being prejudiced.  If you

7     want to speak, go ahead.  If you don't, that's okay.

8          THE DEFENDANT:  I just want to say something.

9          THE COURT:  Go ahead.

10         THE DEFENDANT:  Your Honor, I just want to say that I

11    know I'm wrong, you know, but at this point, it's hard for me

12    to accept 25 years when I see the media do all these other

13    things, guys with 20 murders getting 12 years because they

14    decided to cooperate or do something.  I wasn't out there

15    killing people.  Pharmaceutical companies run these pills.  I

16    don't run them.  The government never noticed that there was

17    ten times pills sold in South Florida and never did anything

18    about it, but I'm the guy who's going to take the fall for

19    everything?  I'm guilty, I understand.  I plead out.  I laid

20    down because I was concerned about my girlfriend.  Her daughter

21    is like my daughter.

22         You know, I'm not perfect; you know what I mean?  I

23    made mistakes.  I just feel that there's a lot of things going

24    on in the world.  I'm not the axis of evil that's being made

25    out for me to be, you know.  Yeah, I speak Chinese.  Yeah, I

1    was involved with people.  I was raised that way.  That's what

2    happened to me.

3          I just feel the punishment should fit the crime; you

4    know what I mean?  I watch TV and I see these guys, obviously

5    the big trial everybody has been watching.  You know, it's

6    just, you know, I don't understand all these numbers.  I don't

7    understand.  I know I'm wrong.  I understand.  I'm just

8    looking -- you know, I don't want to spend the rest of my life

9    in prison.  I'm 42 years old, you know?  I want to marry Anh.

10   I want to have a family, and here I am.  That's all.  I just --

11   that's all I can tell you, your Honor.  Thank you.

12          (Discussion between the Court and Probation.)

13          THE COURT:  Okay, I think that the government's

14   recommendation is a reasonable one.  I'm not going to follow it

15   exactly, but it's close enough, close enough so I think what

16   I'm going to recommend will be fair to the defendant and fair

17   to the government, and that's 20 years.  How much supervised

18   release, six?

19          MR. FOSTER:  Six years, your Honor.

20          THE COURT:  Six years supervised release.  What is it,

21   two counts?

22          MR. FOSTER:  There's two counts that run concurrent.

23          THE COURT:  No, I mean two special assessments?

24          MR. FOSTER:  $200 special assessment, your Honor.

25          THE COURT:  What else?

1          THE CLERK:  Forfeiture.

2          MR. FOSTER:  Forfeiture, I defer to the government.

3          MR. MORAN:  Your Honor, as to supervised release, the

4   maximum term on Count 2 is three years supervised release, so

5   it should be six years supervised release on Count 1 and three

6   years on Count 2 to run concurrently.

7          THE COURT:  Okay, I'll accept that.  Thank you.

8          MR. MORAN:  And the government asks that you impose

9   the forfeiture judgment that you previously entered, which are

10  Docket Nos. 736 and 739.

11         THE COURT:  Okay.  Anything else?

12         MR. FOSTER:  In terms of special conditions, your

13  Honor, in addition to the mandatory special conditions, the

14  Probation Office would recommend that the defendant shall not

15  commit another federal, state, or local crime, and shall not

16  illegally possess a controlled substance.

17         THE COURT:  Any objection?

18         MR. DENNER:  No, your Honor.

19         MR. FOSTER:  The defendant is prohibited from

20  possessing a firearm, destructive device, or other dangerous

21  weapon.

22         THE COURT:  Any objection?

23         MR. DENNER:  No, your Honor.

24         MR. FOSTER:  The defendant is to participate in a

25  program for substance abuse counseling as directed by the

1    Probation Office, which program may include testing, not to

2    exceed 104 drug tests per year, to determine whether the

3    defendant has reverted to the use of alcohol and drugs.  The

4    defendant shall be required to contribute to the cost of such

5    treatment based on the ability to pay or third-party payment.

6              THE COURT:  Any objection?

7              MR. DENNER:  I have no objection to that, but that

8    does segue into the notion that I was going to ask you, if this

9    is the right time, to make a judicial recommendation --

10             THE COURT:  Let me see if I'm through here.  Are you

11   all done?

12             MR. FOSTER:  No.  I have a few more, your Honor.

13             THE COURT:  Wait until he gets through, please.  Go

14   ahead.

15             MR. FOSTER:  The defendant is to participate in a

16   certified batterer intervention program as directed by the

17   Probation Office.  The defendant shall be required to

18   contribute to the cost of services for such treatment based on

19   ability to pay or availability of third-party payment.

20             THE COURT:  Any objection to that?

21             MR. DENNER:  No, sir.

22             MR. FOSTER:  The defendant shall not frequent

23   establishments whose primary purpose is gambling.

24             MR. DENNER:  It's a little vague.  I'm not quite sure

25   how one figures that out, but I guess I object to that on the

1  basis that I don't think that's --

2          THE COURT:  I don't think it's very specific either,

3  so we'll strike that.  Go ahead.

4          MR. FOSTER:  The defendant shall not participate in

5  any gambling activities, including casino gambling, online

6  gambling, lotteries, instant scratch tickets, Keno, and any

7  activities of a similar nature.

8          THE COURT:  I think that's too broad too.  Strike

9  that.

10         MR. FOSTER:  The defendant shall attend a gambling

11  addiction program and/or meetings as directed by the Probation

12  Office.  The defendant shall be required to contribute to the

13  cost of services for such program based on ability to pay or

14  availability of third-party payment.

15         THE COURT:  Any objection there?

16         MR. DENNER:  If it could be stated that he be

17  evaluated to see if he needs that treatment, I have no

18  objection.

19         THE COURT:  Do it that way.

20         MR. FOSTER:  Defendant shall participate in a

21  cognitive behavioral treatment program as directed by the

22  Probation Office.  Such program may include group sessions led

23  by a counselor or participation in a program administered by

24  the Probation Office.  Defendant shall be required to

25  contribute to the cost of services for such program based on

1  ability to pay or availability of third-party payments.

2       THE COURT:  I missed the label you put on the

3  committee.  What's the name of it again?

4       MR. FOSTER:  It's cognitive behavioral therapy

5  treatment.

6       MR. DENNER:  Again, if we could make that subject to

7  evaluation when he gets out years from now to see whether in

8  fact --

9       THE COURT:  Subject to evaluation to see if it's

10  necessary.

11       MR. FOSTER:  And then, lastly, the Probation Office

12  would recommend the judicial recommendation that the defendant

13  participate in substance abuse treatment while in the Bureau of

14  Prisons.

15       MR. DENNER:  That we certainly agree with, if we can

16  get a judicial recommendation for that 500-hour RDAP program.

17       THE COURT:  All right, we'll do that.  Now, you wanted

18  to speak?  Go ahead.

19       MR. DENNER:  That's it.

20       THE COURT:  That was it?  Anything else?

21       MR. FOSTER:  That's all, your Honor.

22       THE COURT:  All right, Mr. Willis, you have now been

23  sentenced, and as one who has been sentenced, you have a right

24  to appeal that sentence if you care to do so.  If you don't

25  have funds to prosecute an appeal, you'll be permitted to

1    appeal without payment of any fees.  If you don't have funds

2    for a lawyer, one will be provided for you.  You have 14 days

3    to file a notice of appeal.  Do you understand that?

4            THE DEFENDANT:  Yes, sir.

5            THE COURT:  Okay.  Anything else?  Anybody?

6            MR. MORAN:  Not from the government.  Thank you, your

7    Honor.

8            MR. DENNER:  No, sir.  Thank you, sir.

9            THE COURT:  Okay, you're all excused.  Thank you.

10           THE CLERK:  Court is in recess.

11           (Adjourned, 2:55 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

UNITED STATES DISTRICT COURT )
4  DISTRICT OF MASSACHUSETTS     ) ss.
CITY OF BOSTON                )

5

6

7          I, Lee A. Marzilli, Official Federal Court Reporter,

8  do hereby certify that the foregoing transcript, Pages 1

9  through 22 inclusive, was recorded by me stenographically at

10  the time and place aforesaid in Criminal No. 11-10212-JLT,

11  United States of America v. John Willis, and thereafter by me

12  reduced to typewriting and is a true and accurate record of the

13  proceedings.

14      Dated this 27th day of October, 2013.

15

16

17

18

19

                  /s/ Lee A. Marzilli
20      _____

                  LEE A. MARZILLI, CRR
21                OFFICIAL COURT REPORTER

22

23

24

25